## LEMUEL WALDRON *et al. versus* JACOB LEE.

A writ of *mandamus* lies to compel a town treasurer to issue his warrant of distress against a collector of taxes neglecting to collect and pay over the same at the time fixed in the assessors' warrant to the collector.

Where an alternative *mandamus* issues in such case to the treasurer, it is not necessary to make the collector a party or to give him notice.

If the facts upon which such treasurer is to issue his warrant of distress are properly certified to him, he has no discretion, but is obliged to issue his warrant.

But if upon the return of an alternative *mandamus* to the treasurer, it appears that the tax is illegal or not duly assessed, the court may refuse to grant a peremptory *mandamus.*

If the person appointed to warn a school district returns that he warned the inhabitants, but without stating the time or manner of warning, and the inhabitants meet and vote to raise a sum of money, and this vote is duly certified to the assessors, they are obliged to assess the tax, and neither they nor the town treasurer can inquire into the regularity of the proceedings antecedent to the meeting.

A school district tax may be assessed upon the valuation of property taken in reference to the town taxes for the same year.

Whether a person who moves into a school district after the valuation for the town taxes has been taken, is liable to be taxed therein until a new valuation is taken, *quære.*

If after a tax has been raised and assessed on the inhabitants of a school district, part of the district is set off into another district, the inhabitants of such part remain liable to pay the tax, the debt being fixed by the assessment.

A town has not power to alter the limits of a school district so far as to destroy the corporation, without its consent, nor so as to annul or impair contracts made with the corporation.

At April term 1827 Waldron and others, petitioners for a writ of *mandamus,* represented, that at a meeting of the inhabitants of the northwest school district in the town of Dudley, on the 5th of November, 1825, a vote was passed to purchase a convenient spot of land for a schoolhouse, and to build a new schoolhouse thereon ; that the petitioners were chosen a committee to make the purchase and to build the schoolhouse ; that it was also voted to raise the sum of 350 dollars for those purposes ; that the clerk of the district, on the 23d of November, 1825, certified this last vote to the assessors of the town, and requested them to assess the sum mentioned upon the inhabitants of the district ; that the assessors, on the same 23d of November, assessed the sum of 359 dollars, in pursuance of the vote and the clerk's certificate thereof, and committed to one Ingraham, a constable and 324

collector of Dud ey, the list of the assessments, with a war rant for collecting and paying in the same to the treasurer of the town, or his successor, on or before the 1st of March, 1826, and certified their doings to Lee, the respondent, then and ever since the treasurer of the town ; that the petitioners purchased a convenient spot of land on the 21st of December, 1825, and on the 7th of March, 1826, contracted for the building of a schoolhouse thereon, and promised in writing to pay the builders the sum of 314 dollars when it should be finished ; that the sum voted and assessed being insufficient for all the purposes for which it was granted, another meeting of the inhabitants of the district was held on the 14th of January, 1826, and afterwards, by adjournment, on the 1st of July, 1826, when it was voted to raise the sum of 200 dollars for the purpose of completing the schoolhouse ; that this vote was, on the 8th of July, certified by the clerk of the district to the assessors of the town, and that thereupon the assessors, on the 12th of July, assessed the sum of 208 dollars and 14 cents, and committed to one Corbin, a collector, the list of the assessments, with a warrant for collecting and paying in the same to the town treasurer by the 1st of September, 1826, and on the same 12th of July certified their doings to the town treasurer ; that Ingraham and Corbin had neglect ed to comply with their respective warrants, and the town treasurer had refused to pay to the petitioners the before mentioned sums from the treasury, though requested on the 1st of September, 1826, because the same were not collected and paid in to the treasurer ; that the petitioners thereupon, on the 8th of November, 1826, requested the treasurer to issue his warrants of distress against the collectors, pursuant to the statute, but that he had refused so to do ; that the schoolhouse was finished on the 1st of August, 1826, and the expenses incurred were still due from the petitioners, as the building committee ; the petitioners therefore prayed that a *mandamus* might issue to the treasurer, requiring him to issue his warrants of distress against Ingraham and Corbin respectively, pursuant to the statute.

Upon this petition an alternative writ of *mandamus* was directed to the treasurer, commanding him to issue his war-

auts as above mentioned, or to show cause to the contrary at the present October term.

Lee now made his return, admitting the allegations in the petition, and also setting forth the returns made by the persons directed to warn the district meetings before mentioned, in neither of which returns was the time or manner of warning specified ; and further stating, that at a meeting of the inhabitants of the town of Dudley, on the 17th of July, 1826, it was voted that the inhabitants belonging to one part of the northwest school district should be set off and form a separate district ; that at a town meeting on the 28th of August, 1826, it was voted to reunite these two districts into one ; that at another town meeting on the 9th of September, 1826, it was again voted to divide the district as before ; and that the two districts thus created remained, each having a school of its own and claiming all the powers and privileges of school districts, and the part set off having built a schoolhouse for their own accommodation ; and further, that no notice was given by the assessors, before they began to make the assessments, to the inhabitants of the district to bring in to them lists of their polls and estates, real and personal, nor was any valuation taken for the purpose of making the assessments, or deposited, before the lists were delivered for collection, in the assessors' office, &c., but the assessments, if made from any valuation, were made from the general annual valuation taken for the purpose of making the town assessments ; that no portion of the assessment committed to Corbin had been collected ; that a portion of that committed to Ingraham had been collected and paid to the petitioners, and a portion of it in the hands of Ingraham remained uncollected.

The cause was argued at Dedham, at October term 1827, by *Newton* and *Tufts*, for the petitioners, and by *Davis*, for the respondent.

The grounds taken by the counsel for the petitioners appear sufficiently in the opinion of the Court. On the point that the town treasurer should act upon the certificate of the assessors, without inquiring into the regularity of anterior proceedings, they cited *Stetson* v. *Kempton*, 13 Mass. R. 283 ; *Sanford* v. *Nichols*, ibid. 288 ; *Saxton* v. *Nimms*, 14 Mass. R.

315 ; *Thayer* v. *Stearns,* 1 Pick. 109 ; *People* v. *Collins,* 7 Johns. R. 549 : — on the point that the assessment of the taxes was made upon the proper valuation, *Nason* v. *Whitney,* 1 Pick. 142 ; *Thurston* v. *Little,* 3 Mass. R. 432 : — and on the point that a town cannot so alter the limits of a school district as to destroy the corporation or impair contracts made by it, *St.* 1817, *c.* 14 ; *Windham* v. *Portland,* 4 Mass. R. 384 ; *Minot* v. *Curtis,* 7 Mass. R. 441 ; *First Par. in Brunswick* v. *Dunning,* ibid. 445 ; *Hampshire* v. *Franklin,* 16 Mass. R. 86 ; *Foster* v. *Essex Bank,* ibid. 245 ; *King* v. *Dedham Bank,* 15 Mass. R. 447.

On the part of the respondent it was suggested, that the collectors ought to have been made parties to the suit, for there might be facts within their knowledge, and essential to their protection, (as that some of the persons assessed had died or become insolvent,) which they ought to have an opportunity of showing, before a warrant of distress is issued against them.

[In answer to this suggestion the opposite counsel referred to Bac. Abr. *Mandamus, D* 3, note, cites 1 Wils. 133; *Rex* v. *Benn,* 6 T. R. 198.]

It is said that the treasurer is not to inquire whether a tax be legal or illegal ; in other words, he is to be called upon to enforce the payment of an illegal tax. But if a collector attempts to enforce the payment of such a tax, a trespass is committed. It surely then was proper for the respondent to ascertain whether the proceedings of the town, school district, and assessors, had been legal, before he should issue his warrant. *Stetson* v. *Kempton,* 13 Mass. R. 283; *Libbey* v. *Burnham,* 15 Mass. R. 147.

If the grant of the taxes by the school district was void, it puts an end to this case. We object to the warning of the district meetings, as wholly insufficient, it not appearing to have been in conformity to the statute of 1799, *c.* 66, § 4. *Davis* v. *Maynard,* 9 Mass. R. 242 ; *Wellington* v. *Gale,* 13 Mass. R. 483.

**327**    Further, the assessors are required to assess a school district tax in the same manner as a town tax. They should therefore give notice to the inhabitants of the district to bring

in lists of their polls and estates, and should make a distinct valuation as the basis of the assessment ; and such valuation should be deposited in the assessors' office, &c. The fair construction of the statutes is, not that the school district tax shall be assessed on the same valuation as the town tax, but that the like course of proceedings shall be pursued in the one case as in the other. Assessments should conform to the variations of property at different periods. If an old valuation is taken as the basis of a school district tax, all new accessions of property within the district will escape taxation *St.* 1785, *c.* 50, § 8, 9 ; 1821, *c.* 107, § 7 ; 1823, *c.* 137, § 3 ; *Thurston* v. *Little,* 3 Mass. R. 429 ; *Thayer* v. *Stearns,* 1 Pick. 482 ; *Nason* v. *Whitney,* ibid. 140 ; *Granger* v. *Par sons,* 2 Pick. 392 ; *Richards* v. *Dagget,* 4 Mass. R. 534.

According to the case last cited, the old school district was annihilated by the act of the town altering its limits. Or if not, at least the warrants to the collectors became inopera tive. They could no longer collect the taxes, and it would be unjust to compel them to pay over what they could not collect.

PARKER C. J. delivered the opinion of the Court. The process prayed for is without doubt proper for the case complained of, if the facts are such as to call for the exercise of the power of the Court in this form. The legislature having given authority to this Court to issue writs of mandamus, the cases suitable for the application of this writ must be determined by the common law. And it is clear by the authorities, that it is the proper, and perhaps it is the only manner in which the sovereign power can compel the per formance of official duty by inferior magistrates and officers of the law. Without such power somewhere the affairs of the public might be brought to a stand ; and as in England, so in this commonwealth, the highest common law judicial authority is made the depositary of this power.[1]

No more proper case can arise for an application like the present, than where those intrusted with the collection of the revenue of the country refuse to perform their duty ; for

*April term*
1828

328

---

[1] See Revised Stat. *c.* 81, § 5.

without a vigorous compulsory power upon them great public mischief might ensue. The state treasury would be embarrassed, if those who are to collect its revenue may not by summary process be compelled to do their duty. So with counties, towns, and divisions of towns, authorized by law to tax the members of these several communities. To insure and enforce the collection of town taxes, when they are assessed and committed to a constable with proper authority, if he fail to do his duty, he is to be compelled by the sheriff &c acting under a warrant from the treasurer of the town, authorizing distress of the collector's goods and chattels and the imprisonment of his person. No notice is required previous to the issuing of such warrant, for the facts are all made to appear of record upon which he has become liable. His choice and acceptance of the office of collector appear on the town records. So the granting of the tax, the choice and qualifications of assessors, their proceedings ending in the assessment, are made known to the treasurer by their certificate ; as is also the commitment of their warrant to the collector, together with the time within which he is to complete the execution of his duty. The treasurer to whom the money is to be paid over is required, if there be a failure, forthwith to issue his warrant of distress. This is in the nature of an execution, and no delay is to be allowed for notice to, or a hearing of the party against whom it issues. This is prompt and summary, but it is essential to the well being of the community. If the subjects of this power suffer by the false return or certificate of the assessors, they must seek redress by action. The wheels of government cannot be stopped to hear his complaints.

The treasurer is merely a ministerial officer ; he has no authority to pause in the execution of his duty, on the suggestion of errors or mistakes in the proceedings. If the facts upon which he is to act are properly certified to him, he has no discretion, but is obliged to issue his warrant.[1] Whether

---

[1] The remedy under the Revised Statutes, in case of the collector's neglect concerning the collection and payment of taxes committed to him, is by suit against the collector, either on his bond, if he has given one, or, if he has not given one, for money had and received. *C.* 8, § 44.

.ne tax be legal or illegal, whether duly assessed or not are
not subjects for him to inquire about.	If there be a tax, an
assessment, a warrant to the collector, all certified to him by
assessors duly qualified to act, his duty is clear and he is
peremptorily commanded by the law to discharge it.

There is however a discretion in this Court, when applied
to for compulsory process against a treasurer, to withhold or
grant it according to the justice of the case, as it shall be
made to appear by the facts exhibited in the return to their
alternative writ.	If it should manifestly appear that a tax
was illegally granted or assessed, so that the officers required
to collect it would have no authority, or the persons taxed
would have a right to restitution by action, without doubt the
Court would withhold the exercise of its power, rather than
throw the parties into an expensive field of litigation.	It is
therefore proper for us to look into the facts stated in the
return of the officer against whom the mandamus is prayed,
in order to determine whether the exercise of his duty, in
issuing a warrant of distress against the collectors mentioned
in the return, ought or ought not to be compelled.

It is objected by the petitioners, that the return is insuf-
ficient, in not stating all the facts necessary to enable the
Court to judge of the law.	But it is not stated what other
facts might have been returned ; so that we must determine on
the return as it stands, whether sufficient cause has been shown
to warrant us in refusing a mandamus.

The first fact alleged as showing that the tax was illegally
raised and assessed is, the supposed insufficiency of the warn-
ing of the inhabitants of the district, of the meeting at which
the tax was voted ; the person to whom the warrant calling
the meeting was directed, having certified in general terms
that he had duly warned the inhabitants, without stating the
time or manner of the warning.[1]	This is not a sufficient ob-
jection, for the inhabitants met and voted, and the vote to
raise the money was duly certified to the assessors, who
thereupon were obliged to proceed in the assessment without
inquiring into the regularity of the proceedings antecedent to

Waldron
*v.*
Lee.

329

---

[1] See *Gilmore* v. *Holt,* 4 Pisk (2d ed.) 261, n. 1.

the meeting of the inhabitants of the district. *Saxton* v *Nimms et al.* 14 Mass. R. 315. If it were made to appear that the inhabitants were not legally warned, and that some of them did not attend because they were ignorant of the time, place, and purposes of the meeting, the objection would have more force ; but at present the objection is formal, and the collection of the tax ought not to have been impeded on that account.

Another objection is, that the tax was not assessed upon any valuation taken with a view to that tax, but upon a valuation of the property of the inhabitants of the town taken in reference to the public and town taxes for the same year, as it stood on the first of May.

The statute authorizing these taxes on the inhabitants of school districts is silent on the subject of a valuation. It was probably not intended to require one, because a valuation of the property of the same inhabitants must necessarily have been taken by the same assessors for the same year. If it be objected that persons may have removed into the district after the town valuation was taken, it may be answered that such persons may not be liable to be taxed ; but this we do not decide ; for the purpose of the tax is to build and repair schoolhouses only, and why should they not be liable, if they came from other parts of the town or from another town ? They participate in the benefits of the schoolhouse, and although they may have contributed in another town or district to the same object, they have in such case voluntarily submitted to the inconvenience.

Another objection is that the district is divided, so that it is not the same which existed when the tax was raised and assessed.

This objection has required and received the full attention the apparent weight of it deserves. It was supposed in argument there might be a difference in regard to the two taxes, one of them having become payable into the treasury before the division of the district, the other afterwards. But we think there is no difference in principle. When a tax is legally voted to be raised for purposes authorized by law, there is an inchoate right in the inhabitants of the

body within which it is raised. The assessment is only the apportionment of the whole sum upon the individuals liable, according to the rules established by law ; and when that assessment is made, each individual becomes indebted for the part or proportion which is assigned to him.[1] He cannot be discharged of this debt but by payment or by abatement, according to the provisions of law. Wherever he goes the debt will follow him, and by the statute he may be pursued by the collector with his warrant of distress into any other part of the commonwealth, or he may be sued for it in some cases provided for by statute ; and if he die without paying, his executors and administrators are liable at the suit of the collector. If by act of the town he and his estate shall, after the assessment of the tax, be made to belong to another district by an alteration of the limits or the creation of a new district, he will still be indebted for the tax assessed before the division or alteration ; and though this may operate unjustly, by subjecting him to another tax for the same object, we think this a matter for the consideration of the town in the exercise of its legislative power. If such an alteration of the district is made against the will and without the consent of the inhabitants who are the subjects of it, which will rarely if ever happen, and probably did not occur in the case before us, the town itself would be bound upon fair principles, though not perhaps compellable, to provide indemnity ; as the legislature may be in some cases, where they may constitutionally affect by their doings the property of individuals, but not in such manner as to give a constitutional right of redress. But the argument founded on the possible abuse of power in a town, would be quite as strong on one side of this case as on the other. A district legally constituted[2] raises money by vote to erect a schoolhouse suitable in its dimensions and accommodations to the existing state of the district as established. by law. Contracts, which by the statute it is expressly authorized to make, are entered into so as to be binding on

---

[1] See *Inglee* v. *Bosworth, post*, 502.

[2] As to the legal mode of forming school districts and defining their limits, see Revised Stat. *c.* 23, § 24; *Withington* v. *Eveleth*, 7 Pick. 106; *Perry* v. *Dover*, 12 Pick. 206; *Taft* v. *Wood*, 14 Pick. 367.

the corporation, for districts are made by law corporations liable to be sued. A debt therefore exists against it in its corporate capacity, which may be finally enforced against any inhabitant of the district  The schoolhouse is built under such contract, and is placed in the centre of the existing district with a view to the best accommodation of the whole. Then comes an act of the town, possibly to gratify some discontented inhabitants of the district, which sets off a portion of the district into a new district, leaving the residue still a corporation liable for all debts incurred, and with a schoolhouse so placed perhaps as to be quite inconvenient for the inhabitants as newly arranged, and much larger than their reduced number would require. Certainly this would be at least as unjust as the case stated on the other side of the argument.

We cannot think this is the legal effect of an alteration of the limits of a district under such circumstances, but we are satisfied that the liability which attached by the assessment of the tax, cannot be removed but by an entire abolition of the corporation, with all the contracts made with it ; an act which we think is not within the legitimate authority of towns, for reasons which we shall proceed to state.

Were it not for the case of *Richards* v. *Dagget*, 4 Mass. R. 534, and the opinions expressed by Chief Justice *Parsons* in behalf of the Court, which were not required by and are not strictly applicable to the case decided, we think that the case before us would scarcely have raised a doubt of the right of the collector to enforce the collection of the tax against all who were assessed ; or of his liability to the warrant of the treasurer for not performing his duty under his warrant. In the case cited an alteration of the limits of the district took place after the vote passed to raise the money, but before it was assessed, and it was determined that the payment of the tax could not be enforced against those who had been set-off to the new or other district. We certainly do not intend to overrule that decision, nor is there occasion for it in order to sustain this application, notwithstanding the intimation in the case of *Whittemore* v. *Smith*, 17 Mass. R. 349, that the vote to raise money might create a debt against those who were at the time liable to be taxed. We think the better ground is, that no individual debt is

incurred until the assessment is made ; (we speak in relation to taxes in school districts.)   Neither is it necessary to deny the opinions expressed by *Parsons* C. J. upon the supposititious case of an assessment actually made before the division, and the bills committed to the collector ; for we think that the legal character of school districts as existing when that decision was made, and that which now exists by legislative acts, have established a difference which would be likely to change the whole course of reasoning of that great man, were he called upon to decide the present case.   Then the school district had no legal name or qualities ; it was merely a section of the town privileged to determine for itself the location of its schoolhouse and raise money for the building and keeping it in repair.   It was not a corporation, could not sue or be sued, make contracts, or enforce them.   Every thing but the vote to raise money was to be done by the power of the town.   It was at least doubtful whether a devise of land to a school district was valid.   *Barker* v. *Wood*, 9 Mass. R. 419.

The *St.* 1789, *c.* 19, which is the first act of legislation on this subject, gave no power whatever to school districts, not even to raise money.   The money was raised by the town itself for all the inhabitants, and apportioned upon the several districts.   The schoolhouses themselves were to be built by the town.   By *St.* 1799, *c.* 66, power is given to the inhabitants of school districts to determine the place of the schoolhouse, to raise money by vote for building and repairing it, and for procuring necessary furniture and utensils ; and no other authority whatever is given.   And thus stood the law when the case of *Richards* v. *Dagget* came before the Court ; except that by *St.* 1801, *c.* 11, they were empowered to purchase a building for a schoolhouse and land for the schoolhouse of the district to stand upon.   The district was incapable of making contracts, or of suing or being sued ; then it could not be indebted ; and in this state of things t might well be determined, that a vote to raise money did not create a debt against the individuals, and it might well be doubted whether the town could not annihilate the district even after a tax was assessed, so as to destroy the

power of the collector altogether in relation to it.  So com
pletely were the districts placed under the guardianship of the
towns, that if the inhabitants did not raise money for building
a schoolhouse, the town might compel them against their will,
by voting money sufficient and assessing the inhabitants of the
district.  See *St. 1814, c. 142.*  It cannot be said then that
they were corporations or even *quasi* corporations.  They
were creatures of the town, to be moulded and even destroyed
by the will of this superintending power.

But by *St.* 1817, *c.* 14, an entire change of the capacities
and character of these lesser anomalous bodies is effected.
They are made a body corporate, so far as to bring and main-
tain an action on any agreement, made with any person or
persons, for the non-performance thereof, or for any damage
done to their schoolhouses, and are made liable to have an
action brought and maintained against them for the non-per-
formance of any contract by them made.  And by the second
section power is given to them to take and hold, in fee simple
or otherwise, any estate, real or personal, which has been or
may be given by any person or persons for the purpose of
supporting a school or schools in the district, and to apply the
same for the purposes aforesaid, and to prosecute and defend
any suit or suits relative to the same.[1]

By this statute school districts are placed on the same
footing, in regard to the objects for which they are created,
as towns, parishes or other municipal corporations ; and we
think that the power of towns over them is necessarily, by
virtue of this statute, abridged.  If before, under the power
" to limit and define districts," or " to alter and renew "
them, or " to district the town anew," power to destroy
them altogether was given by implication, we think this latter
power is expressly or by equally strong implication taken
away.  Is it possible that towns have a right to impair or
destroy contracts made by or with such corporations, sanc-
tioned by the legislature ?  And yet if they can destroy the
body, they destroy the contract.  Can the town, by a vote,

---

[1] As to the powers of school districts, see Revised Stat. *c.* 23, § 28; *Taft v.
Wood,* 14 Pick. 364.

repeal the act of the legislature, which invests these corporations with the qualities and power of contracting and being contracted with, of taking and holding real estate, of maintaining actions in relation to it and their contracts ? And yet they do it, if they annihilate the body, the district. We do not mean to question the power of towns still to alter the limits, so far as may be consistent with their preservation as bodies corporate ; the legislature may do that in regard to towns and other corporations. But was it ever heard, that the legislature itself could disfranchise or destroy a town without its consent ? Such a high act of authority would hardly be claimed by a legislature arrogating to itself omnipotence, like the British parliament. We hold then, that a division of the district, made by the town after these taxes were assessed, did not destroy the contract, but left a body corporate with all the powers given to it by the legislature.

We consider then, that by dividing the northwest district, and setting off part of it into another district, the original corporation was not destroyed, but that it retained its entity and legal capacity, and that its corporate powers remained unimpaired. We consider further, that the inhabitants set off were charged with the taxes legally voted and assessed before the separation, and are now liable for the same ; the debt being fixed by the assessment. If this operates hardly upon those who now belong to the new district, it is a hardship resulting from the law and cannot be helped. It is however no more hard, than if the division had not taken place until after they had paid their taxes ; nor than it would be, if having once paid towards the building of a schoolhouse in a district within whose bounds they should live, they should be afterwards transferred to another district where it is necessary to build a schoolhouse. And the principle has been uniformly sanctioned by the legislature in setting off individuals of one town or parish and annexing them to another, it being always on condition that they remain liable for taxes already assessed, and sometimes for those which have been only voted, notwithstanding by such annexation they become liable to be taxed in the community with which they are

Waldron
*v.*
Lee.

newly associated ; of which numerous instances may be seen in the statute book.

Such annexations are generally, without doubt, at the instance of those who are the subject of it, and so probably are the alterations of the limits of school districts. Whether it be so or not in this case, we have no evidence ; but nothing appearing to the contrary, and there being no remonstrance from the persons who were set off, we may presume it was with their consent ; otherwise we must presume that the town, of its own accord, exposed these persons to a double taxation ; a presumption we are quite unwilling to make, as it would show an utter disregard to the rights of their fellow-citizens.

We think therefore that the collectors ought to have proceeded in collecting the tax ; that not having done so, they have subjected themselves to the warrant from the treasurer ; and that having refused to issue it, all the preliminary measures having been taken to impose it upon him as a duty, we are bound to require it of him in behalf of the commonwealth, whose power in this respect is to be exercised by this Court in this form.[1]

---

[1] *Quære*, does this writ now lie in a case like the above, against a treasurer, since the revision of the statutes in this commonwealth ?  The provisions of *St*. 1785, *c*. 46, § 6, seem not to have been introduced into the Revised Statutes.  Revised Stat. *c*. 8, § 44.