# Commonwealth ex rel. The Attorney General v. Mathues, Appellant.

*Judges—Judicial interest—Decision by one judge who was without interest —Appeals.*

Where one or more judges of a court decline to sit in a case by reason of personal interest in the result, the powers of the court necessarily devolve on the remaining judges even if only a minority of the court.

*Judges—Salaries—Constitutional law—Act of April 14, 1903, P. L. 175.*

The Act of April 14, 1903, P. L. 175, entitled "An act to fix the salaries of the judges of the Supreme Court, the judges of the Superior Court, the judges of the court of Common Pleas and the judges of the Orphans' Court," applies to all judges in commission at the time of the approval of the act, and not merely to those thereafter to be commissioned.

An act of assembly relating to the salaries of judges will not be construed so as to give judges upon the same bench, engaged in the performance of exactly the same judicial functions, different compensation, those senior in

commission receiving smaller, and those junior larger compensations, unless such construction is the unavoidable result of a clear and plain mandate of the constitution.

Article V, section 18 of the constitution of 1874, which provides that the judges "shall, at stated times, receive for their services an adequate compensation, which shall be fixed by law and paid by the state," unequivocally expresses the mandate for the adequate compensation of the judges, and negatives any restriction in regard to any increase thereof. It gives beyond question or doubt the power in case of inadequacy to increase judicial compensation to adequate amounts during incumbency.

The provision of article III, section 13, of the constitution that "no law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment," has no application to the judiciary, and cannot be read into the judiciary article, which refers to a separate and co-ordinate branch of the government.

Judges are not public officers within the generic words used in section 13, article III of the constitution.

The word "adequate" as used in the judiciary article means fully equal to the requirement or occasion, commensurate. It does not mean average or graduation.

The Act of April 14, 1903, P. L. 175, was the first substantial compliance with the requirements of schedule No. 17 of the constitution which provides that "the General Assembly at the first session after the adoption of this constitution shall fix and determine the compensation of the Supreme Court and of the judges of the several judicial districts of the commonwealth." The tentative and partial acts in this direction passed from time to time, increasing different salaries, did not exhaust the power of the legislature over this subject, or comply with the mandate of the schedule.

There can be but one adequate compensation for each of the judges of the same court, because, no matter how much greater the experience or learning of one member of it may be than that of another, there can be no difference in the actual performance of the same judicial functions.

The state treasurer is vested with sufficient discretionary powers in the administration of his office to enable him to call in question the constitutionality of the act of April 14, 1903, relative to the salaries of the judiciary, by refusing to pay warrants drawn upon him on their account and thus secure judicial interpretation of the statute, when in his judgment it contravenes one of the express provisions of the constitution.

Argued Oct. 17, 1904. Appeal, No. 6, May T., 1904, by defendant, from order of C. P. Dauphin Co., Commonwealth Docket, No. 24, awarding writ of peremptory mandamus in suit of commonwealth of Pennsylvania, ex relatione Hampton L. Carson, attorney general of the commonwealth of Pennsylvania, for the use of Craig Biddle, F. Amédée Brégy, Mayer Sultzberger, William W. Wiltbank, Norris S. Barratt, Robert N. Willson, J. Willis Martin, Joseph C. Ferguson, Clement B. Penrose, Robert Ralston, G. Harry Davis, Harold M. McClure, Edward W.

Biddle, Thomas F. Taylor, judges learned in the law of the courts of common pleas and of orphans' courts in the commonwealth of Pennsylvania, and all other judges learned in the law in the said commonwealth similarly interested, *v.* William L. Mathues, State Treasurer of the Commonwealth of Pennsylvania. All the justices were present at the preliminary argument except MR. JUSTICE BROWN, who for personal reasons, not connected with the question, preferred not to sit, but all except MR. JUSTICE THOMPSON being interested in the question at issue, declined to take part in the discussion or decision, which thus devolved upon MR. JUSTICE THOMPSON.

Petition for mandamus.

One of the judges of the court of common pleas of Dauphin county being interested in the question, and the other having been a member of the legislature at the time of the passage of the act of April 14, 1903, Judges VON MOSCHZISKER of Philadelphia county and BELL of Blair county were called in by the Dauphin county court to hear and decide the case in the court below. Both of these judges were without interest, having been commissioned after the passage of the act of assembly in question.

VON MOSCHZISKER, J., April 5, 1904:

The application for a mandamus in this case is in the name of the commonwealth of Pennsylvania, upon the relation of the attorney general, and avers that on April 14, 1903, an act was passed by the legislature and approved by the governor of Pennsylvania, entitled " An act to fix the salaries of the judges of the Supreme Court, the judges of the Superior Court, the judges of the courts of common pleas and the judges of the orphans' courts," followed by the text of the entire act (P. L. 175); that the legislature had appropriated the funds required by the act, and the same were in the hands of the state treasurer; that the auditor general had drawn his warrants in favor of all the judges in the state in accordance with the terms of said act; that the state treasurer had refused to pay certain of these warrants, and that they had been returned unpaid and protested; that the attorney general had advised the state treasurer that the act of April 14, 1903, was constitutional and

binding upon him, and that it was his duty to make payment
of the said warrants, but that he still refused to pay; and the
application ends with a prayer for a mandamus directed against
the state treasurer, requiring him to perform his duty under
the law, and to make payment of all warrants drawn by the
auditor general in accordance with the act of April 14, 1903.
In the return to the alternative writ of mandamus awarded
(actual issuance of which was formally waived by the defend-
ant), all material facts are admitted, and the respondent con-
tends that the act of April 14, 1903, is unconstitutional so far
as it attempts to increase the salaries of all judges in commis-
sion at the date of its approval; that it is his duty as state
treasurer to prevent unlawful disbursements of public money
to any person or persons; and the right of the attorney general
to appear as relator is denied, and it is contended therein that
the commonwealth is not a proper plaintiff.

The Act of Assembly of June 8, 1893, P. L. 345, relating to
mandamus, sections 3 and 4, provides that " the writ of man-
damus may issue upon the application of any person beneficially
interested," and that " when the writ is sought to procure the
enforcement of a public duty the proceedings shall be prose-
cuted in the name of the Commonwealth on the relation of the
Attorney General."    Upon the objections raised as to the right
of the attorney general to appear as relator, and as to whether
the commonwealth is a proper plaintiff, it is necessary to con-
sider whether the writ in this case is to compel the enforce-
ment of what is meant by public duty and defined as such under
the law.    If every act of the state treasurer which he lawfully
does in his capacity as a public officer is to be considered as a
performance of a public duty, then the performance of every
act which he refused or neglected to do would come within
the meaning of the section of the act of assembly referred to,
and the proceeding would be in the name of the commonwealth.
It is obvious that such a test is too broad, because, while all
citizens are, in a certain sense, as a part of the ethics of good
government, interested in the proper discharge of every duty
owed by a public officer to an individual merely as a private
person, still the neglect of such a duty is in itself not a wrong
to the public.    It is the presence of a common wrong which
arises from the neglect of a duty and which determines, among

other things, whether the duty is a public one. The fact that the common wrong may also induce a private injury does not in any way invalidate the test nor make the wrong any the less a public one.

" The question whether the Attorney General can maintain an action, or whether such action must be brought by a private party depends upon whether the injury to be redressed is public in its nature, affecting public interests, or whether it is merely private, affecting private rights and interests. In the former case the Attorney General may, as a general rule, maintain the action or proceeding, but in the latter he cannot: " Am. & Eng. Ency. of Law (2d ed.), vol. 3, p. 480.

" In the case of a wrong which constitutes a public as well as a private injury, the Attorney General may maintain an action in respect to the public injury : " Am. & Eng. Ency. of Law (2d ed.), vol. 3, p. 481.

If there is an injury to a private party in common with the whole public, the right of the private party to obtain redress in his own name is denied, because, if he interposes, any other might, and as the decision in one individual case would be no bar to any other, there would be no end to litigation and strife, and so it has been repeatedly held that " a private party may enforce a duty to the public only where there is a special injury to himself, as distinguished from injury to him in common with the whole public : " Buck Mountain Coal Co. v. Lehigh Coal and Navigation Co., 50 Pa. 91. " It is only when a private party suffers a special private damage or injury, differing in kind and not alone in degree from that suffered by the people at large, that he has such a specific legal right as may be enforced by mandamus : " Com. ex rel. Freeman v. Westfield Borough, 11 Pa. C. C. Rep. 369.

It should be remembered that the writ of mandamus is in its origin a prerogative writ, and the discretion of the court is large in determining as to when it should be issued. If the people of the state in their sovereign capacity are interested in the performance of a public duty to the extent of a common injury, either actual or threatened, in case the duty is not performed, then the community as a whole is the party interested, and as the business of the public is carried on by officers selected by the people, it is the duty of these agents to see that

the wrong is righted or the threatened injury averted, and the attorney general is one of the officers specially charged with the duty of representing the public in the litigation. " It is for the public officers exclusively to apply when public rights are to be subserved : " Heffner v. Com., 28 Pa. 108 ; Sanger v. County Commissioners, 25 Me. 291. " And if the person has clearly manifested a determination to disobey the laws it is not necessary to wait until the evil is done before issuing the writ: " Attorney General v. Boston, 123 Mass. 460.

It has even been held that where a statute authorizes the issuance of the writ " on the information of the party beneficially interested," that the people, " if it is a case of public duty neglected, is the party beneficially interested, and the state, that is, the public, should be the complainant, and her officers should conduct the suit: " Bobbett v. State ex rel. Dresher, 10 Kansas, 9.

Applying the principles above stated to the present case, it is readily conceded that the payment of the salary of any individual judge, looked at in the light of the payment of a sum of money earned by an individual and due to him, is a private right, and each judge is beneficially interested. As we have already indicated, the fact that the writ in this case may serve a private interest does not in any way exclude the presence of a public duty to be performed. The public at large is most essentially and materially interested in the maintenance of the judiciary as one of the necessary and independent divisions of the government; the constitution requires that they shall be paid by the state an adequate compensation, and the question is one of such public importance that the enforcement of the public duty to pay, under authority of law, the salaries of the judiciary, is one which should not depend upon the willingness of any individual judge, in his private capacity, to attempt to enforce his right as a matter of private benefit.

The petition for the mandamus and the answer or return show a refusal on the part of the state treasurer to honor the warrants drawn for the salaries of almost the entire judiciary of the state, on the ground that the act of April 14, 1903, cannot constitutionally be construed to entitle judges in commission at the date of the approval thereof to the salaries thereby fixed. It is plain to be seen that a refusal on the part of the

judges thus situated to perform the duties of their office on the ground that they are not receiving the adequate compensation guaranteed them by the constitution would work a public calamity of the gravest nature.

The question was not decided in Com. ex rel. Elkins, Attorney General, for the use of the School District v. Barnett, State Treasurer, 199 Pa. 161. This was a case where a mandamus was asked for by a school district for the purpose of making the state treasurer pay its share of the money appropriated. There is nothing in the case which would lead one to believe that the test of a public duty under the act of 1893 is that the respondent is a public officer in possession of public funds which he is withholding for the payment of warrants drawn upon him by the properly authorized public officer, and under the instructions of another public officer in relation to the discharge of a duty imposed by statute.

In the Barnett case the court seems to have assumed that the question was a public one, because upon the discussion of the question of jurisdiction (mandamus having been applied for in the court of Centre county, instead of the Dauphin county court, under the act of 1893), the court says that " If the convenience of getting a decision on a question of public importance outweighs the inconvenience of going to a local court for it, there is nothing in the statute or in the public policy on which it is founded to prevent the officers from so doing. "

While it is impossible to weigh with accuracy the elements which make up a public duty, still in the present case by contrasting the private rights of the judges with the extent of the duty owed, and the consequences of its neglect, a method of measurement is given whereby it is apparent that the duty owed is greater than that which the private rights demand, and the presence of a public duty is clearly demonstrated.

Having shown that this proceeding is properly instituted in the name of the commonwealth on the relation of the attorney general, the next subject to be considered involves an examination of the pleadings in order to determine the questions that are properly raised upon this application.

The act of 1893, relating to mandamus above referred to, provides that if the right to require a performance of the act

is clear, and it is apparent that no valid excuse can be given
for not performing it, a peremptory mandamus may be awarded
in the first instance and directed to issue forthwith.   Unless
the right is clear on the face of the petition only an alterna-
tive writ of mandamus should issue.   The application in the
present case is made for a peremptory mandamus to issue in
the first instance, but it was treated as an application for
an alternative mandamus, the actual issuance of which was
formally waived by defendant.   The proceedings thus reached
the same stage as if a rule to show cause, supported by affi-
davit, had been granted and made absolute and an alter-
native writ of mandamus had issued.   The return or answer
which has been filed by the defendant shows that the applica-
tion has been treated in the manner we have indicated.   This
answer is really a return to an alternative writ, and is in the
nature of a demurrer, because giving merely legal reasons
against the validity of the writ.   Filing a return or answer
instead of a demurrer is proper practice, because a demurrer
may not be filed to a petition or application for a mandamus :
Plymouth Township Commissioners v. Sweeney, 10 Pa. Dist.
Rep. 617.   A demurrer could not be filed to the application
when we keep in mind that an alternative writ cannot be de-
murred to, and the return assumes the issuance of an alter-
native writ.

After the application and return or answer had been filed
the attorney general made a motion to strike out such parts
of the respondent's answer as raised the constitutional point,
because it is irresponsive, immaterial and irrelevant to the
issue, and because it involves a usurpation of power on the
part of the respondent to suggest such a question.   The
proper way, however, to attack a return is by motion to quash
or demurrer.   Here the answer constitutes the return in ordi-
nary cases, and therefore the motion to strike out might be
proper practice if it were a case where a motion to quash a re-
turn would be entertained; but bearing in mind that the
motion to quash is only granted where a return is frivolous
and clearly bad, the motion to strike out must be treated as a
demurrer to the answer, and on demurrer the whole question
of law, including that of the goodness of the writ itself, is
considered.

Under section 15 of the act of 1893, the plaintiff may demur to the return or he may plead to or traverse all or any of the material facts contained therein, and this section indicates the proper practice in the present case.

In the case of Kell v. Rudy, 1 Pa. Superior Ct. 507 (1896), RICE, P. J., gives a general discussion on the proper practice under the act of 1893, and his remarks there are pertinent to the present application where he says: "This is not a case where it was apparent on the face of the petition that no valid excuse for not performing the act could be given, therefore, regularly an alternative writ should have been issued. The defendant, however, appears to have waived that formality and filed an answer setting forth his reasons for refusing to grant any other certificate than such as he had tendered to the plaintiff. We may, therefore, treat the rule to show cause as a substitute for an alternative writ and the answer as a return thereto. . . . When this stage of the proceedings was reached it was the privilege of the plaintiff to demur to the return or to plead to or traverse all or any of the material facts therein contained."

In Com. v. The Commissioners, 32 Pa. 218, the counsel for the relator moved the court to disallow a return and to award a peremptory mandamus, and on this motion argument was made. The court treated the motion and argument made on behalf of the relator as a demurrer to the return of the respondents, and considered the case as if it had been entered in form.

However, as the main question raised and argued on the motion of the attorney general to strike out was whether or not the state treasurer, being a ministerial officer, had a right in his answer to raise the constitutional question as a defense to his refusal to honor the warrants drawn on him under the act of 1903, and as the attorney general, representing the state, contended for his position so stoutly, and assumed the attitude that the state treasurer was a mere ministerial officer, bound to blindly obey the mandates of the legislature as interpreted by the governor and his law officer, on the theory that all executive officers are under the immediate supervision and control of the governor, and that there should be a refusal to recognize in any manner the right of the respondent as an officer to raise the question contained in the averments of his answer, and as

the attorney general further contended that the issue involved was vital to the cause of efficient government, and the determination thereof would affect the interests of the commonwealth to an extent not limited to the present case, we, therefore, deem it our duty to examine the question with more than ordinary care.

As to the right of the state treasurer to defend against an application for the writ of mandamus on the ground of the alleged unconstitutionality of an act of the legislature, the Pennsylvania cases are unsatisfactory. Com. v. James, 135 Pa. 480 (1890), is a recent case holding that such a plea is not a good defense where the officer refusing has no discretion. Here a mandamus was granted against a clerk of the court of quarter sessions, who had declined to file and record the resolutions of the boards of school directors, in a city of the third class, which had accepted the provisions of the Act of May 23, 1889, P. L. 274. The court in a per curiam opinion said: " The act referred to requires him to receive and record these papers ; his duties were purely ministerial, and the court below properly awarded the peremptory mandamus. It is but just to say that his act in refusing does not appear to have been one of insubordination, but was intended to test the constitutionality of the said act of 1889. We are of opinion that the constitutional question cannot be raised in this way. We really have no case before us, beyond the mere refusal of the clerk to file the papers."

But does this case correspond to the present case of the state treasurer, a high constitutional officer of the commonwealth, obligated to care for and protect the funds of the people, and who, furthermore, has the most vital pecuniary interest under his bond ? We think not.

There are a number of old cases and two comparatively late Pennsylvania cases, taking it for granted that the state treasurer has this right, but not passing directly upon the point. Com. v. Butler, 99 Pa. 535 (1882), and Com. v. Gregg, 161 Pa. 582 (1894), were both cases where the state treasurer had refused to honor requisitions, because he did not consider the acts valid. In both cases the court granted a peremptory mandamus, and in neither case did the court criticise the action of the officials in contesting the validity of the act. Com. ex rel.

v. Lemon, 2 Chester Co. Rep. 167, does not bear in any way upon this question. The court simply decided that the treasurer should pay the money he had on hand—not that the court would not go into the constitutionality of the act. The famous case of Com. v. Mann, 5 W. & S. 403 (1843), at pages 421 and 422 of the report, throws some light upon the subject.

The Act of March 30, 1811, sec. 8, 5 Sm. L. 228, provides : " The State Treasurer shall pay all grants, salaries, annuities, gratuities and pensions established by law, and make all other payments which are or shall be so fixed by law. " Does this not call for some exercise of discretion upon his part ? Is he not more than the court clerk who assumes no obligations ? The Pennsylvania decisions above referred to point toward but do not establish this distinction. If " established by law " means merely founded upon a legislative enactment, then, the state treasurer is a clerk, with no discretion whatsoever ; but if this clause means " established by a (valid) law," then a different aspect is put upon the matter. The question we are now considering as to the right of an administrative officer, such as the state treasurer, to defend against a mandamus proceeding such as the present by questioning the constitutionality of an act of the legislature, seems to be a hitherto unsettled point in Pennsylvania, and it is necessary to make a survey of the law in other jurisdictions before arriving at a satisfactory conclusion.

In the other jurisdictions we find anything but harmony on the subject. The federal cases uniformly hold that an officer, though he be no more than a ministerial officer, has no right to obey an invalid law ; that his duty to the state and national constitutions is greater than his respect for the acts of the legislature ; that such an act is no law at all, neither compelling him to obey nor protecting him if he has obeyed it. The opposing cases urge the obstruction to the course of government in the state if every officer can refuse to act. Some of the states, while admitting the right of certain officers to contest the validity of an act, deny it to the more humble officers. In all states, and in the federal courts as well, it is conceded to be a step taken at the officer's peril and which he should not take lightly : 19 Am. & Eng. Ency. of

Law, (2d ed.), 764 ; 23 Am & Eng. Ency. of Law (2d ed.), 369.

In State Lottery Co. v. Fitzpatrick, 3 Woods, 222 (1879), an injunction was sought to prevent officers of the state from enforcing an act taking away a charter in violation of the obligation of contract. BILLINGS, D. J., said : " The State is not amenable to any suit, and is shielded by the immunity from any process or legal responsibility. But as an unconstitutional law has no inherent force, either to authorize or protect, and, therefore, no claim to be obeyed and no authority to divest rights, the agents of its administration, of whatever name or character, may be called to answer and are individually responsible." He then proceeds, page 263, to strike the keynote of the position of the federal courts : " The officers of every state of the United States, whether executive or judicial, owe to the Constitution of the United States, a fealty, an homage, an obedience, surpassing that which they owe to their constituents of the state. "

In Poindexter v. Greenhow, 114 U. S. 270 (5 Sup. Ct. Repr. 903), the court decided a case of detinue for goods unlawfully taken by a tax collector. This was one of the Virginia bond cases ; these involved a breach of the obligation of contract. The state of Virginia had agreed to accept certain bonds in payment of taxes—later, they refused. The court, through MATTHEWS, J., said : "It is said that the tax collector who was sued was an officer and agent of the State, engaged in collecting its revenues, under a valid law, and that the tax he sought to collect was lawfully due ; that, consequently, he was guilty of no personal wrong, but acted only in an official capacity, representing the State, and, in refusing to receive the coupons tendered, simply obeyed the commands of his principal, whom he was lawfully bound to obey. . . . . He relied on the Act of January 26, 1882, requiring him to collect taxes in gold, silver, United States treasury notes, national bank currency, and nothing else, and thus forbidding his receipt of coupons in lieu of money. That, it is true, is a legislative Act of the State of Virginia, but it is not a law of the State of Virginia. The State has passed no such law, for it cannot; and what it cannot do it certainly in contemplation of the law has not done. . . . He stands, then, stripped of

his official character, and confessing a personal violation of the plaintiff's rights for which he must personally answer, he is without defense."

In Norton v. Shelby Co., 118 U. S. 425 (6 Sup. Ct. Repr. 1121), FIELD, J., said : " An unconstitutional act is not a law; it confers no rights ; it imposes no duties ; it affords no protection; it creates no office. It is in legal operation as inoperative as if it had never been passed." In Huntington v. Worthen, 120 U. S. 97 (7 Sup. Ct. Repr. 469), FIELD, J., delivered the decision in a case where an injunction was sought by residents of Massachusetts to enjoin the collection of a tax. The defense was that the law exempting the property of the plaintiffs was in conflict with the state constitution. The court said : " When, therefore, under the advice of the Attorney General, the board of railroad commissioners treated as invalid the directions of the statute, that the value of embankments, etc., should not be included in the estimate of the railroad track, it obeyed the constitution rather than the legislature. It may not be a wise thing, as a rule, for subordinate executive or ministerial officers to undertake to pass upon the constitutionality of legislation prescribing their duties, and to disregard it if in their judgment it is invalid. This may be a hazardous proceeding to themselves and productive of great inconvenience to the public ; but still the determination of the judicial tribunals can alone settle the legality of their action. An unconstitutional act is not a law; it binds no one, it protects no one."

A late case is Yale College v. Sanger, State Treasurer 62 Fed. Repr. 177, decided by SHIPMENT, (circuit judge of the district of Connecticut). The complainant alleges the defendant is about to obey an unconstitutional act and divert from it the income of certain funds, secured to it by a contract with the state of Connecticut. The court said: "It is equally well settled that an officer of the state, who, as an aggressor, invades the property or vested pecuniary rights of an individual in his specific real or personal property, cannot, in a suit at law against him for his tort, or in a bill in equity to restrain the commission of the intended injury, when adequate relief cannot be otherwise afforded, successfully justify his conduct upon the ground that he is acting in obedience to the authority of an unconstitutional statute of the state."

It is thus conclusively shown that the United States courts regard an unconstitutional act of the state as no act, and regard the officer obeying such statute as in no wise protected. It would, therefore, seem a very harsh doctrine that would deny the state treasurer the right to obtain judicial instruction by refusing to obey that which he may honestly believe to be an unconstitutional law, in view of the fact that the federal courts hold him a wrongdoer, liable to any party injured, if he should act thereunder.

Turning to the decisions in the state of New York, we find the case of People ex rel. v. Board of Canvassers, 129 N. Y. 360 (29 N. E. Repr. 345), involving the question whether a board of election officers have the right to refuse a certificate to a party constitutionally incapable of holding the office. EARL, J., said: "Can the relator come into a court of law and ask its aid in his violation of the constitution and his proposed intrusion into the office of senator?" They decided he could not; and, further on in the opinion they say that should an election inspector deny a man the right to vote, and, upon mandamus, it should appear that he had never been qualified, the court should have to sustain the inspector, who always, nevertheless, acts at his peril in such a case.

New Jersey is in line with the federal courts, although they put a very heavy burden upon the disobedient officer. In State v. Kelsey, 44 N. J. L. 1, there was a refusal by the secretary of state to turn over certain moneys as provided by statute. BEASLEY, P. J., said: "Statutes are not avoidable even by judicial decision, except upon very satisfactory grounds, and nothing short of an almost absolute certainty with respect to the entire invalidity of an act would afford an excuse to an officer for his refusal to execute it. Any less stringent rule of official conduct in such a respect would be a public evil of very great magnitude. For a financial agent of the government to refrain from putting into operation a legislative policy plainly evidenced by a formal enactment, acting on his own judgment, unassisted by any judicial tribunal, would, unless in an instance of such clear illegality that the flaw would be at once admitted by every enlightened mind, be inconsistent with every dictate of law and public policy." Yet this case recognizes the right of the officer to raise the question.

· In Kentucky we have the case of Norman v. Kentucky
Board of Managers, 93 Kentucky, 537 (20 S. W. Repr. 901).
This was a refusal by the state auditor to draw a warrant in
pursuance of a law which he contended was invalid.    HOLT,
C. J., said : " It is a general rule that a court will not listen
to one who says a legislative act is unconstitutional, unless his
rights are involved or he has a right to question it.    Section 230
of our new constitution, however, says : 'No money shall be
drawn from the state treasury except in pursuance of appro-
priations made by law,' and our statute forbids the issue by
the auditor of a warrant upon the treasurer, unless the money
to pay the same has been appropriated by law.    If the act of
the legislature be void for want of power to pass it, or because
it was not passed in the manner required by the constitution,
then it is not law; and the auditor is vested with such power
and occupies such a position that it is not only his right, but
his duty, whenever he is called upon to order the payment of
money out of the treasury, to inquire whether it is being done
legally.    He is, in a certain sense, a trustee, and the public in-
terest requires that his office should give him the right to
question the validity of a legislative act, under which, by
means of his warrant, the public money is to be expended."

In California we have the same rule, evidenced by the case
of Denman v. Broderick, 111 Cal. 96 (43 Pac. Repr. 516).
Here, again, we have the refusal by an auditor to grant war-
rants for salary as provided by an act of the legislature, the va-
lidity of which he attacked.    The court said : " We see no force
in the point that the respondent has no interest in the question
here involved.    The act, under which the petitioner claims,
being unconstitutional and void, there is no law authorizing
the respondent to draw the warrant, and to do the act demanded
of him would be to violate his official duty and oath, and sub-
ject himself to liabilities and penalties."

It will be noted that both the Kentucky and California cases
correspond in some respects to the present case.

Michigan makes a distinction between different classes of of-
ficers.    This is set forth in the case of Maynard v. Board of
Canvassers, 84 Mich. 228 (47 N. W. Repr. 756).    This was a
refusal by the board of canvassers to give a certificate of elec-
tion, and their reason was that the election law was invalid,

but the court, in its opinion, admits that where personal or property rights are involved, and great inconvenience and damage would result if prompt action were not taken, in such cases the public officer can allege the invalidity of the act. The court said: "The canvassers have no right to shift this burden of proof by withholding the certificate or issuing it to another. But it is said that constitutional questions have often been raised and decided by this court in mandamus proceedings. This is true where personal or property rights are involved and great inconvenience and damage would result if prompt action were not taken, In such case the public officer or body charged with the performance of duty may either decline to act on the ground of alleged unconstitutionality of the act or he may proceed. In either event, mandamus will lie to set him in motion in the one case and restrain him in the other. But this does not apply to cases where the duty of the officer is only clerical or ministerial, and the law provides an ample remedy afterwards to test the validity of his action, and that, too, without inconvenience or damage."

In North Carolina is to be noticed a tendency to distinguish between the cases of different officers. This is clearly shown in the case of Gilmer v. Holton, 98 N. C. 26 (3 S. E. Repr. 812), where the supreme court refused this defense of unconstitutionality in the case of a clerk of the superior court, saying, "It is a proper occasion for us to remark, that if every subordinate officer in the machinery of the state government is to assume an act of the legislature to be in violation of the constitution, and refuse to act under it, it might greatly obstruct its operation and lead to most mischievous consequences. This is only permissible, if at all, in cases of plain and palpable violation of the constitution, or where irreparable harm will follow the action."

Wisconsin is in line with the federal decisions, as shown by the case of State v. Tappan, 29 Wis. 664, where a town clerk refused to levy a tax because he considered the law invalid, and it was contended that the clerk, who was a mere ministerial officer, had no power to pass upon its validity. The court held: "The act being void, it binds no one, and any person may assert its true character and refuse to obey it."

Nebraska, in the case of Van Horn v. State, 46 Neb. 62 (64

N. W. Repr. 365), decided that where a supposed act and the constitution clash, the constitution must be obeyed. Ministerial officers are not bound by their oaths to obey an unconstitutional statute.

Cases have arisen as to whether or not an officer derives any defense from an invalid act in case he is sued by a party injured through its enforcement. Besides the cases already cited from the federal courts, the supreme court of Massachusetts, in the case of Kelly v. Bemis, 70 Mass. 83, decided that an officer could derive no protection from an act of this character. The supreme court of Indiana, in the case of Sumner v. Beeler, 50 Ind. 341, held to the same effect in a suit for illegal arrest under an unconstitutional statute. The court said : " No question in law is better settled, and this is admitted by the counsel for the appellants in their brief, than that ministerial officers and other persons are liable for acts done under an act of the legislature which is unconstitutional and void. All persons are presumed to know the law, and if they act under an unconstitutional enactment of the legislature, they do so at their own peril, and must take the consequences."

There are cases from jurisdictions of high standing which contradict the principles which are laid down in the cases just cited. For instance, the supreme court of Maine, in the case of Smyth v. Titcomb, 31 Maine, 272, holds that a tax collector cannot refuse to act because of the invalidity of the act. The court said : " He is not responsible for the law, or for the possible wrongs which may result from its execution. . . . Public policy, as well as public necessity and justice, require a prompt and efficient action from such officers."

Likewise, the state of Illinois, in the case of People ex rel. v. Salomon, 54 Ill. 39, holds this view, saying : " Being a ministerial officer, the path of duty was plain before you. . . . Your only duty was obedience. The collected will of the whole people was embodied in that law. A decent respect to them required that all their servants should obey it." This was an attachment for failure to obey a mandamus.

So holds the case of United States ex rel. v. Marble, 3 Mackey (D. C.), 49 (1883), where the court said : " It is objected on behalf of the commissioner of patents that the act of Congress of June 18, 1874, providing for the registration of labels is

unconstitutional, and therefore void.   A very elaborate, ingenious and, perhaps, under appropriate circumstances, successful argument has been made to sustain this position.    But we think the point raised has no application to this case.   We do not think it lies in the mouth of a government official to call in question the constitutionality of a law directing him to perform a purely ministerial duty."

We notice this case is cited by the attorney general in his paper-book, but as the law of the District of Columbia is supposed to conform to the federal law of the land, the cases cited from the supreme court of the United States allow no doubt on this question, and show that this case cannot well be considered.

The attorney general likewise cites a large number of other cases to support the contention that an administrative officer has no right to make the defense that we have been considering.    The case of Flournoy v. Jeffersonville, 17 Ind. 169, cited by him, cannot be held to put Indiana in favor of this view, as is clearly shown by the case of Sumner v. Beeler, 50 Ind. 341. This is also true of the California case of Downer v. Lent, 6 Cal. 94, cited, which is clearly ruled by the contrary case of Denman v. Broderick, 111 Cal. 96 (43 Pac. Repr. 516).    The New York cases of People v. Collins, 7 Johns. Rep. 549, and Halstead v. The Mayor of New York, 3 N. Y. 430, cited, are clearly ruled, so far as this question is concerned, by the contrary case of People v. The Board of Canvassers, 129 N. Y. 360 (29 N. E. Repr. 345).    The Michigan case of Attorney General v. Board of County Canvassers, 64 Mich. 607, cited, is explained by the case of Maynard v. Board of Canvassers, 84 Mich. 228 (47 N. W. Repr. 756).    As to the citation from Amy v. Supervisors, 78 U. S. 136, made by the attorney general, we need only refer to the case of Huntington v. Worthen, 120 U. S. 97 (7 Sup. Ct. Repr. 469).    The attorney general cites the Massachusetts case of Waldron v. Lee, 22 Mass. 323, but the following excerpt from the opinion in that case shows that it does not conform to the rule contended for by the attorney general :  " If it should manifestly appear that a tax was illegally granted or assessed, so that the officers required to collect it would have no authority, or the persons taxed would have a right to restitution by action, without doubt the court would withhold the exercise of its power, rather than throw the par-

ties into an expensive field of litigation." Therefore, it is safe to presume that the law of Massachusetts must be taken to be contrary to the attorney general's contention. The case of State v. Hastings, 14 Wis. 75, is cited, but there is evidently an error here, for examination of the volume indicated fails to disclose any such case; however, the later case of State v. Tappan, 29 Wis. 664, seems to'hold a contrary view. We can hardly subscribe to the doctrine which the attorney general seeks to support by the case of State v. Buchanan, 24 W. Va. 362, to the effect that the mere fact that the governor, as the constitutional head of the state government, has signed a bill deprives the state treasurer of any and all right to question its constitutionality.

These cases will give a general view of the law in this country. It is not harmonious, but the weight of authority appears to be in favor of the cases which hold to the right, and, in some instances, the duty, of certain administrative officers to refuse to act under what they honestly believe to be an unconstitutional act. The American and English Encyclopedia of Law (2d ed.), vol. 19, page 764, states : " Under either view, if an officer has a personal interest in the question, or if the nature of the office is such as to require him to raise it, he may make the defense." It can be seen that the courts of other jurisdictions have drawn a distinction between strictly ministerial officers, such as inspectors of elections and clerks of courts, and higher officers, such as state treasurers and state auditors, who, according to the cases, seem called upon or permitted to exercise a certain amount of judicial interpretation.

Although we do not decide that all ministerial officers of the state government have a right to refuse to act under a law because they conceive it to be unconstitutional, and thus constitute themselves tribunals to pass upon the validity of acts of the legislature generally, we do hold in this particular case that the state treasurer, being a high constitutional officer of the commonwealth, intrusted with the funds of the state, under the law, has the right to raise by his pleadings, the question of the constitutionality of the act of April 14, 1903, fixing the salaries of the judges of the commonwealth. For the reasons given, the motion to strike out must be overruled and the answer of the state treasurer stand as stated.

To return to the pleadings; considering the motion to strike out as a demurrer, the issue raised is as to the validity of the answer, whether, on the whole, it presents a legal excuse for not performing the command of an alternative writ, and in order to properly determine this question, the answer must be looked at in the light of the averments in the application.

The court will not issue a mandamus to compel the state treasurer to honor the warrants of the auditor general in this instance, unless it is clearly satisfied that the act of 1903 is constitutional in its attempt to raise the salaries of judges in commission at the date of its approval, and the question of the constitutionality of the act in this respect is squarely raised by the pleading in this case.

It is but proper, before entering upon the consideration of this vital question, to notice the appropriate rules of construction by which we should be guided.

A leading rule for judicial construction of constitutional provisions is that every possible presumption and intendment must be made in favor of the constitutionality of an act, and the courts can only interfere in cases of clear and unquestioned violation of the fundamental law. The authority of courts to declare statutes unconstitutional is a power of high responsibility and not to be exercised except in cases free from doubt, and all doubt is to be resolved in favor of the constitutionality of the act: Sedgwick's Construction of Statutory and Constitutional Law (2d ed.), 409; Bank v. Smith, 3 S. & R. 63 (Chief Justice TILGHMAN); Com. v. Butler, 99 Pa. 535 (Chief Justice SHARSWOOD); Craig v. First Presbyterian Church, 88 Pa. 42 (Justice PAXSON); In re Sugar Notch Borough, 192 Pa. 349 (Justice MITCHELL, now Chief Justice).

" There is a presumption in favor of the constitutionality of a statute, and in accordance therewith, when a statute is susceptible of two constructions, one of which supports the act and gives it effect, and the other renders it unconstitutional and void, the former will be adopted, even though the latter may be the more natural interpretation of the language used: " 26 Am. & Eng. Ency. of Law (2d ed.), 640.

" In case of irreconcilable conflict between the provisions of a constitution, that which is more specific in subject-matter

will usually prevail as against a more general one : " 6 Am. & Eng. Ency. of Law (2d ed.), 927.

Where in the same instrument is to be found a particular enactment and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment, this rule being subordinate to the principle that a construction giving full effect to all parts should be adopted if possible, and we are to inquire whether or not one necessarily comes in conflict with the other: 26 Am. & Eng. Ency. of Law (2d ed.), 619.

" The uniform construction given to a provision of the constitution by the legislature, with the silent acquiescence of the people, including the legal profession and the judiciary, and the injurious results which would ensue from the contrary interpretation, are proper elements of a legal judgment on the subject : " Moers v. The City of Reading, 21 Pa. 188. If an act be susceptible of the interpretation which has been put upon it by long usage, the court will not disturb that construction : Pochin v. Duncombe, 1 H. & N. (Exch.) 842, Pollock, C. B.

The views expressed by members of the convention, as set forth in the debates of the constitutional convention and the report of the committee as to changes made by the new constitution, cannot be resorted to in order to arrive at a judicial interpretation of any part of the constitution, if a sensible interpretation of the part in question can be made under the usual rules of judicial construction. This is on the principle that the final draft of the constitution is what the people adopted, not the preliminary debates leading up to it, or the construction put upon it by members of the convention afterwards : Com. v. Balph, 111 Pa. 365 ; Maxwell v. Dow, 176 U. S. 581, (20 Sup. Ct. Repr. 448) ; Bank v. Com. 19 Pa. 144 ; County, of Cumberland v. Boyd, 113 Pa. 52.

In Eakin v. Raub, 12 S. & R. 330, a statement by Gibson, J., is as follows : " A constitution or a statute is supposed to contain the whole will of the body from which it emanated, and I would just as soon resort to the debates in the legislature for

the construction of an act of assembly as to the debates in the convention for the construction of the constitution."

Where an article in a constitution on a specific subject (or department) of government contains a complete system in itself, it should not be changed in any particular in judicial construction by reading into it a general article, which in terms is inconsistent therewith, where both articles can stand within their own sphere : Com. v. Griest, 196 Pa. 396.

Where a power, therefore, has always been exercised by the legislature, the constitutional withdrawal of it by the people must be plain. If doubtful, it will not be made clear by construction. The people, through the legislature, have unlimited power, except where they impose upon themselves constitutional restraints : Pittsburg v. Railroad Co., 205 Pa. 13.

When the general terms used in a general section of the constitution cover a specific case by the letter, that is not within the spirit and real intent thereof, they will be held not to apply to such a specific case : Clark's Estate, 195 Pa. 520.

" Constitutions are not to receive a narrow or technical or too literal construction. They get their authority from the adoption of the people, and they are to be read in a broad and, as far as possible, untechnical way to carry out their purpose : " Clark's Estate, 195 Pa. 520 ; Page v. Allen, 58 Pa. 338.

We are safe in saying that a cardinal rule to be kept in mind is, that all parts of the constitution are of equal authority and binding operation, and that the various parts are to be understood and construed so as not to conflict with each other, and so that all may stand together ; and in making such a construction we have a right to consider the general history of the development of the various portions of the constitution.

Bearing these general principles in mind, we will now take up the consideration of the real question at hand. Is the act of April 14, 1903, constitutional, so far as it attempts to increase the salaries of judges in commission at the time of its passage and approval?

Article V, is the judiciary article of the constitution. Section 18 thereof is in the following words : " The judges of the Supreme Court and the judges of the several courts of common pleas and all other judges required to be learned in the law, shall, at stated times, receive for their services an adequate

compensation, which shall be fixed by law and paid by the
State.   They shall receive no other compensation, fees or per-
quisites of office for their services from any source; nor hold
any other office of profit under the United States, this State
or any other state."

The words used in this section—" shall, at stated times, re-
ceive for their services an adequate compensation, which shall
be fixed by law, and paid by the State "—are exclusively
peculiar to the section itself, and are not to be found anywhere
else in the constitution, and when we look at them in the
light of their historical development, as well as in the light of
the true meaning of the words themselves, the whole section
becomes so perfectly plain that one is filled with wonder that
its meaning should be questioned at all.   They first appear in
the old constitution of Pennsylvania, adopted in 1790, and
the words, " an adequate compensation to be fixed by law"
were placed there after thoughtful consideration as an improve-
ment upon a like clause in the constitution of the United
States, which is in the same general terms as the Pennsylvania
clause, but without the phrase, " an adequate compensation to
be fixed by law."   This clause was continued in the constitu-
tion of 1838, and re-enacted into the present constitution of
the state in 1873; the language in the present constitution
differing from that of the constitution of 1790 and the consti-
tution of 1838 in the substitution of the words, " which shall
be fixed by law " for the words " to be fixed by law; " in the
striking out of the words, " which shall not be diminished
during their continuance in office," and, further, in the modi-
fication of the prohibition as to the holding of other offices of
profit, so as to make the prohibition extend to offices of profit
" under the United States, this State or any other state."   We
do not see that there is any real difference in the first change
of the words above noted, and we will show hereafter that the
striking out of the second phrase above quoted worked no dif-
ference in the law.   The other change made is not relevant to
the consideration of the question before us.

The words " shall be fixed" clearly relate to some future
legislative action, and, fortunately, we have a judicial expres-
sion of opinion on those words in the great case of Com. ex
rel. v. Mann, 5 W. & S. 403, where Judge ROGERS, on

page 411, said : "Now, what is meant by an adequate compensation to be fixed by law? No other interpretation can be given to it than that the compensation is to depend upon some future legislative enactment. The legislature are to determine under their constitutional responsibility, from time to time what constitutes an adequate compensation. . . . The reasons for this distinction, and they are most satisfactory, are these : ' The fluctuations in the value of money, the state of society, rendered a fixed rate of compensation in the constitution inadmissible. What might be extravagant to-day, might, in half a century, become penurious and inadequate.' "

That these words have always been considered in this light by the people of the state and by the legislature is shown by the fact that, acting by authority thereof, they have from time to time, and on many occasions, raised the salaries of the judiciary so as to make them adequate at the periods of the various enactments. Even has this been so under the present constitution. By the Act of June 8, 1881, P. L. 56, the salaries of the Supreme Court judges were increased. By the Act of June 4, 1883, P. L. 74, a new schedule of salaries for the common pleas judges was established, and by the Act of June 13, 1883, P. L. 91, a new schedule of salaries for the orphans' court judges was established. Under the old constitution, numerous instances of increases from time to time occurred. After the constitution of 1790 the salaries were fixed at £500 per annum, and subsequently increased, and that increase again followed by another increase; and so after the constitution of 1838 were the salaries fixed and increased. We will discuss the case of Com. v. Mann, 5 W. & S. 403, more at length later on.

The word "adequate" has a fixed and settled meaning. It is derived primarily from the word adeo, adire, to come to; and, secondarily, from adequito, adequare, to ride up to, to come to meet, to equalize or bring to a level. In a Dictionary of Synonyms and Antonyms, by C. J. Smith of Christ's Church, Oxford, published in London, in 1881, the word "adequate" is said to mean "equal to in required measure or object or purpose ; sufficient; fit ; satisfactory ; fully competent; able." The antonym is "unequal; insufficient; incompetent; in-

adequate." Webster defines "adequate" as "equal, proportionate or correspondent; fully sufficient; commensurate." "Inadequate" as "not adequate; unequal to the purpose; insufficient to effect the object; unequal; incomplete, defective; as inadequate resources, power, ideas, representations and the like." The Century Dictionary defines "adequate" as "equal to what is required; suitable to the case or occasion; fully efficient; proportionate; as an adequate supply of food." The antonym is "inadequate; incompetent; insufficient to effect the end desired; incomplete; disproportionate; defective."

We hold the above section of the constitution to be an absolute mandate upon the legislature to provide "adequate compensation" for the judges. It is within the power and the duty of the legislature, and of the legislature alone, to determine, in the first instance, what is adequate compensation, and after this determination has been reached, then it is the right of the judges to receive what is fixed. It cannot, with any show of practical reasoning, be argued that this word "fixed" means that when the legislature has once fixed salaries under the mandate, that their power is exhausted. Such a construction would make a dead thing out of the constitution, and would be entirely contrary to the latter-day spirit of constitutional construction. Mr. Justice PAXSON, in Wheeler v. Philadelphia, 77 Pa. 338, well expresses his thought when he says : " We will not presume that the framers of that instrument (the constitution), or the people who ratified it, intended that the machinery of their state government should be so bolted and riveted down by the fundamental law as to be unable to move and perform its necessary functions."

What may be an adequate compensation at the beginning of a long term of years, we know, in the light of common knowledge, is almost bound to become inadequate before the expiration thereof, so that the words used in this constitutional section necessarily imply a power by law to carry out the mandate thereof, to change such compensation, so as to bring it up to adequacy in accordance with the changes of time.

If this line of reasoning is not correct and true, why, then, were these peculiar words used in reference to the salaries of the judiciary that are not to be found in any other portion of

the constitution, and why was the word "adequate" used at all? There is no possible explanation that appeals to the reason of man except the common sense explanation that is conveyed by the words themselves, which have been judicially construed as before shown. But the objection has been made that when the legislature once fixed the salary, as to judges taking office under the salary as fixed, they were bound by the salary existing at the time of their election and taking of office, and that any change of salary that would bring about an increase could only lawfully apply to judges taking office after the approval of the act. Certainly this cannot be so on any general principle of law, for to so hold we would have to consider that a judge, in accepting a term with a definite salary attached to it at the time, entered into a contractual engagement with the state that he would serve out his term without an increase of salary. Many well-considered cases have decided that there is no such contractual relation existing between the public and those that serve it in official capacity: Com. v. Bacon, 6 S. & R. 322; Barker v. City of Pittsburg, 4 Pa. 49; Com. v. Mann, 5 W. & S. 403; McCormick v. Fayette County, 150 Pa. 190; Butler v. Pennsylvania, 51 U. S. 402.

However, it is said that article III, section 13, of the constitution of Pennsylvania, viz: "No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment," controls, and that under that provision of the constitution, the act of 1903, increasing the salaries of all the judges in the state, is not constitutional in its attempt to increase the salaries of judges in commission at the date of its approval, and can only be constitutionally applied to judges taking office after the date of its approval.

Why should this general section be held to govern and control and, in fact, overthrow the plain meaning of the special section as to judicial salaries, which for years has been held by common practice, acceptance by the people, judicial construction and numerous legislative enactments thereunder, to allow and dictate increases in judges' salaries so that the same shall always be kept up to an adequate standard? Shall we say, simply because this section uses the general phrase "any

public officer," that it of necessity means the judges? Of course, judges in a certain sense are public officers, but are they public officers in the sense meant by this section of the constitution is the question to be here answered. Surely the mere use of a general term in a clause of the constitution which, if construed in its most literal sense, would make that clause inconsistent with a most important and special part of the instrument, must lead us to hold, what is most apparent, that the general term used must in the particular instance at hand, be construed according to its spirit and real meaning and not according to its letter. In construing the constitution we must constantly keep in mind the fundamental distinctions which exist among the three great departments of the government—the legislative, the executive and the judicial. All parts of the constitution should be considered of equal authority and binding operation, and understood and construed so as not to conflict with one another, and it is inconceivable to think that the mandatory provision as to the adequacy of judicial salaries, relating exclusively to that department of the government, the upholding of the independence of which has always been one of the greatest cares of the people, is to be rendered inoperative and made nugatory by a general provision, couched in the most general terms, located in another part of the constitution which deals with the restrictions and regulations of the legislative power.

Let us examine this section in comparison with section 18 of article V, and see whether or not section 13 of article III must be read into the judicial section, or whether it is so inconsistent therewith that it cannot possibly be said to apply thereto.

In the first place, where section 13 says, "No law shall extend the term of any public officer," to that extent it certainly cannot mean a judge, for the terms of the judges are expressly fixed by section 2 of article V, as to the Supreme Court judges, at twenty-one years, and as to the common pleas judges, by section 15 of article V, at ten years. Therefore, the judiciary article fully provides as to the terms of all judges, so that the legislature would have no power over increasing such terms.

Section 13, article III, goes on to say "Or increase or diminish his salary or emoluments after his election or appointment."

We believe that we have shown most plainly that section 18 of article V in itself not only gives the right to the legislature to increase salaries, but contains a mandatory direction that the legislature shall increase the salaries of judges so as to keep them up to an adequate standard; so that it is not necessary to repeat the argument here.

We now come to the question: Are the judiciary dependent upon section 13 of article III to prevent the legislature from diminishing their salaries during the term for which they may have been elected? It is not essential to the question before the court to decide as to the right of the legislature to diminish the salary of a judge during the term for which he may have been elected, and we do not make any decision on that point at this time, but we state most emphatically that it is our belief that the legislature have no right to diminish the salary of a judge during the term for which he may have been elected, and that this protection to the judiciary is not in any sense dependent upon section 13 of article III of the present constitution of the state. The case of Com. v. Mann, 5 W. & S. 403, establishes this point, to our mind, beyond a doubt. It is perfecty true that that case was decided under the old constitution of 1838, which contained in the judiciary section the words, "an adequate compensation to be fixed by law, which shall not be diminished during their continuance in office," and that the phrase, "shall not be diminished during their continuance in office," was stricken from the present constitution and is not to be found therein, but, nevertheless, anyone who reads that case carefully will see that Judge ROGERS did not found his decision exclusively upon that phrase in the old constitution, but founded it on fundamental constitutional principles underlying the entire structure of our constitutional government. We will cite the words of the judge: "If, by the remarks already made, I have succeeded in establishing the position that the complete independence of the judiciary is a fundamental principle of the Constitution, designed mainly for the protection of public and private rights, and that the construction put upon that clause of the Constitution aims a fatal blow at it, then may I not here safely rest the argument? For no course of reasoning can render the proposition plainer, that the pretension of the respondent is at war with the spirit of the Constitution."

In that case the relator, a judge, on going into office, was entitled to receive from the commonwealth a salary of $1,600 per annum. This salary was afterwards increased $400 per annum, and, subsequently, the legislature repealed the increase. The relator asked for the salary as increased, on the ground that the legislature had no right to reduce his salary during the term for which he had been elected. The answer made to this was that he went in at a fixed salary of $1,600 per annum, and that the legislature had not attempted to decrease that fixed salary, but that the extra $400 was a mere gratuity, and could be taken away by the legislature just as it was given. Let us see what Judge ROGERS said as to this. After tracing the historical development of the recognized right of the judiciary to a fixed and adequate compensation, reference is made on page 408 to the then constitution of Pennsylvania, and the opinion goes on to say : " They have not ordered a permanent salary simply, but they have directed an adequate salary to be provided, thereby securing, as far as human laws could do, the independence of that invaluable and indispensable branch of government. If, then, these views · be correct, and that they are cannot be reasonably questioned, it follows that any con-stuction, come from what quarter it may, which tends to defeat or nullify this fundamental and vital principle of constitutional law, must be unsound. And now let us examine the grounds of the respondents' return. A distinction is attempted between judges appointed after and before the act of July 19, 1839, the act by which the Legislature increased the salary of the relator. Whilst it is admitted that the former are entitled to receive their increased salary, it is denied that the latter are in the same situation. The propriety of the distinction I confess my-self unable to perceive. The sum of the argument is, that be-cause the Legislature thought proper, by way of gratuity, as it is called, to add to the salary of the relator, they have the right, notwithstanding the constitutional prohibition, to take it away. That the power that can create can likewise destroy. But this, it is obvious, is an unsound position, as it by no means follows that because, for reasons which will be hereafter stated, they thought it right and just to increase the compensation of the relator, they are at liberty to withdraw it under the pretext that, as it was a gratuity, they were not constrained from re-

suming their bounty when they deemed it expedient. But to test the correctness of the argument let us inquire what is the inevitable result of the position assumed by the respondent? If admitted in the extent claimed, and it is not susceptible of limitation, does it not lead to the entire frustration of the very object which the framers of the Constitution had in view, and which they have guarded with such sedulous care? If it be correct that the power over a man's subsistence amounts to a power over his will, what instrument better calculated to give the Legislature an undue and improper influence over the judicial department of the government than by an address in the manner proposed to their hopes as well as their fears. As, for example, take the case in hand. Here the Legislature have assumed the control of the relator so far as he could be influenced by the possession or loss of $400 a year. Cases may occur when, with the aid of the additional salary, it may be merely a decent support of himself and family. A power, therefore, to reduce it may, it is obvious, be equivalent to a power to deprive him of office altogether."

The last few words of the above quotation speak so strongly that it is impossible to get away from them—" A power, therefore, to reduce it may, it is obvious, be equivalent to a power to deprive him of office altogether."

The judiciary are peculiar unto themselves, an independent and high class of officials, elected for exceeding long terms, giving their entire time to the public service, and distinguished from other officials in the fact that upon taking office they are deprived by law and custom from deriving an income from prior and usual sources, being confined to their salaries alone for subsistence; with the always present public necessity of keeping up and supporting their absolute independence and dignity, and this not so much for the benefit of the judge as for the good of society as a whole.

If it should be held for a moment that the legislature, after fixing the salary of a judge, had power to reduce it, we would be obliged to hold that they would have the power to reduce the salaries of all judges, as, in fact, such laws must be general, and, therefore, if they passed any such laws, they would be obliged to reduce the salaries of all judges. If they can pass a law reducing the salaries of judges, then they can pass a law

practically sweeping away the salaries entirely, and if they can practically sweep away the salaries—" the power over a man's subsistence amounting to a power over his will "—they can crush and destroy the whole judicial department of the government. If this is possible, then the legislature by an act could destroy the government itself, for the judiciary is a co-ordinate branch of the government, without which the whole fabric would be bound to fall to pieces. Therefore, it is most plain that the judiciary do not need the alleged protection given by section 13 of article III to preserve them against diminishment of salary. Not only the mandate that the legislature shall keep judicial salaries up to an adequate standard, but the actual structure of our constitutional government is the protection given. The legislature is ordered by the people to keep salaries up to an adequate standard, and it is for them, from time to time, to say in the first instance what is adequate. What they may concede to be adequate may be or become more than adequate, but that would not give the legislature power to reduce. That right we have no doubt does not rest with the legislature, but rather is a judicial question. The judiciary might voluntarily, if the needs of the government required it, surrender a portion of their fixed salaries, but no portion thereof could be wrested from them by the legislature. Therefore the word " diminish " in section 13 of article III is not necessary to be read into section 18 of article V of the constitution in order to maintain an independent judiciary.

The next point to be noticed about section 13 of article III is the insertion of the word " emoluments," which is defined in Apple v. Crawford County, 105 Pa. 300, to be " any perquisite, advantage, profit or gain arising from the possession of an office," and by Anderson to be " any perquisite, advantage, profit or gain arising from the possession of an office. Imports, then, more than ' salary ' or ' fees.' " Certainly this is not meant to apply to the judiciary, for section 18 of article V says : " They shall receive no other compensation, fees or perquisites of office for their services from any source."

Thus we see, by the analysis of section 13 of article III that no part of it is necessary to be read into the judiciary article in order to make that complete, and, in fact, no part of it or word of it is applicable to that article, and that that por-

tion of it which declares against the increase of salaries is absolutely and utterly inconsistent with the judiciary article, and, therefore, cannot be held to apply thereto.

Another glance at the constitution will show us plainly that the phrase " any public officer," as used in section 13 of article III, does not mean for a moment to cover all public officers in the state, for if we look at section 8 of article II, concerning the legislature, we will find this provision : " The members of the general assembly shall receive such salary and mileage for regular and special sessions as shall be fixed by law, and no other compensation whatever, etc. No member of either house shall, during the term for which he may have been elected, receive any increase of salary, or mileage, under any law passed during such term." It is plain to be seen that this general section 13 is not meant to apply to members of the general assembly, for the special provision, as above quoted, covers the matter of increase of salary without regard to section 13 ; and as to a diminishment of salary, it is fair to presume that the people who adopted the constitution thought it was unnecessary to provide that the legislature should not diminish their own salaries, as they had that in their own power, and if they saw fit to diminish them, that was no concern of the people. We cannot answer this argument by saying that members of the legislature are not state officers, for if we look at section 4 of article VI we will find that they are specially referred to as officers in the following words : " All officers elected by the people, except governor, lieutenant governor, members of the general assembly," etc. Therefore, for some reason, not necessary to be here considered, it was conceived by the framers of the constitution and by the people who adopted it, that, although section 13 refers to any public officer, it was not meant to cover members of the legislature, the article on the legislature covering the same matter itself. Exactly what has been said as to members of the legislature can be said as to the judiciary. It was not intended to cover the judiciary, the article on the judiciary making full provision for all the matters contained in general section 13, so far as the judiciary are concerned.

In addition to all this, it can well be maintained that the construction that section 13 of article III is not intended to

cover the judiciary was adopted by the constitutional convention itself, when, in the schedule appended to the constitution, they declare, over the signature of every member of that convention, as follows : " The general assembly, at the first session after the adoption of this constitution, shall fix and determine the compensation of the judges of the Supreme Court and of the judges of the several judicial districts of the commonwealth, and the provisions of section 13 of the article on legislation shall not be deemed inconsistent herewith."

The constitution then was about to be given to the people, and, if adopted, it would contain the inhibition that "No law shall increase or diminish the salary of any public officer after his election or appointment." This inhibition would, of course, have been binding on the next legislature, which was to meet in the following January. We are also to bear in mind that the compensation of judges was then fixed by a general act of the legislature. Mr. Cyrus G. Derr, of the Reading bar, in an interesting paper published in the Legal Intelligencer, volume of 1903, pages 320 and 321, treats of this phase of the question in such a convincing manner that we will here take the liberty of adopting his words :

"It thus became necessary or advisable for the convention to take note of section 13 of article III, to the end that the power of the legislature might be made clear.

" The method to be adopted for clearing up the said matter depended upon what section 13 aforesaid meant.

" If that section was intended to embrace the judges and to forbid the increasing of their salaries during their respective terms, then the method to be adopted for giving the legislature the power to act at its next session would have been by way of excepting such action from the operation of section 13.

" If, on the other hand, the said section did not apply to the judges, then it would be sufficient to say that section 13 should not be regarded as inconsistent with such initial action by the legislature.

" The method by exception would be in substance this :

" ' The legislature, at its first session, shall fix the salaries of the judges, and such legislative action is excepted from the operation of section 13 of article III.'

" The method by construction would be in substance this :

" ' The legislature, at its first session, shall fix the salaries of the judges, and section 13 of article III shall not be construed to forbid this.'

" The first method would clearly imply that the judges were embraced in the class of public officers contemplated by section 13 of article III, while the second method would clearly declare that the judges were not embraced in the said section.

" The convention did not adopt the method of exception, but adopted the method of construction, when it declared in section 17 of the schedule that the provision forbidding the changing of salaries of public officers should not be inconsistent with such initial act of the legislature, thus :

" ' The general assembly, at its first session . . . . shall fix and determine the compensation of the judges . . . . and the provisions of section 13 of the article on legislation shall not be deemed inconsistent herewith.'

" Now, if section 13 of article III was not inconsistent with the changing of judicial salaries, at the time of the first meeting of the legislature in 1874, how can it be regarded as having altered its meaning and become inconsistent with similar legislative action in 1881, or in 1883, or finally in 1903 ? "

The interpretation which we have put upon the judiciary article of the constitution, to the effect that the legislature thereunder have the power to increase the salaries of judges from time to time, so as to always have them adequate to the period, is one that has long been accepted and given to the words contained in that article. The clause certainly being susceptible of such construction, it is reasonable to believe that the people who adopted the constitution so understood it, for the reason that the people, through the legislature, have ever since so understood it and so treated it. This being so, no court should take it upon itself to alter such a construction. We are to recollect that the legislature did fix salaries in 1874, and they increased them in 1881, again increased them in 1883 and again in 1903, and that heretofore all persons concerned have assented or acquiesced therein, and that even now there is not a taxpayer in the state who has come forward to raise a question as to the right of the legislature in the premises. Such construction must, under the well-established rule, be adhered to now.

At argument both the attorney general and counsel for the defense read and, to a degree, urged upon the court the debates of the constitutional convention, and reports of committees of the constitutional convention.  After a most exhaustive examination of authorities, we have reached the conclusion that we have no right to be guided by such matter.  The very fact that the very same debates were used by both counsel for respondents and the attorney general to illustrate and demonstrate their respective points of view, shows in itself how unsafe it would be to make a constitutional interpretation upon any such evidence.  We are fully aware that there is a line of cases and matter to be found in the text-books, to the effect that where there is obscurity in the meaning, in certain instances, contemporaneous construction is properly resorted to, and in some instances certain cases have allowed the examination of debates and papers upon the constitution, but the weight of authority is most decidedly against such methods of construction, and in the present case we conceive that it would be absolutely wrong to resort to these means for the purpose of making a proper judicial construction of the portions of the constitution here involved.

We are not to lose sight of the fact that we are here dealing with a question that is the product of a long historical struggle —the independence of the judiciary and the right to a fixed term and adequate compensation.  We are also to remember that in this struggle, although the judiciary from time to time demanded, and always secured, an adequate, although never a liberal, compensation, still, the great question of the struggle was the right to the permanency of tenure, a right which is not now in question.  When the people fixed the term of the judiciary at long periods, and put a mandate in the constitution that the legislature should give them fixed and adequate salaries, they placed a trust in the hands of that branch of the government, and the presumption always is that public officers will perform a public trust, not that they will default therein or abuse the trust, and we prefer to believe that the legislature have performed, and will continue to perform, their trust, rather than to stand in any fear of a wrong being attempted at some time in the future by one branch of the government against another, even if the power to commit such

a wrong be admitted to exist, which we thoroughly believe is not so.

For the reasons before given, we hold that the act of 1903 in question is constitutional, and could be constitutionally applied to all the judges in the state in commission at the time of its approval, and should be so applied at the present time. We might rest our conclusions here, but as the subject is one of so much public importance, we will consider it from another point of view.

The twenty-sixth section, article 5 of the constitution, on the judiciary, provides as follows : " All laws relating to courts shall be general and of uniform operation, and the organization, jurisdiction and powers of all courts of the same class or grade, so far as regulated by law, and the force and effect of the process and judgments of such courts, shall be uniform ; and the general assembly is hereby prohibited from creating other courts to exercise the powers vested by this constitution in the judges of the courts of common pleas and orphans' courts."

This " uniform operation " clause is new to the present constitution.

The question arises, is the act of April 14, 1903, to fix the salaries of judges of the several courts, a law relating to courts ? And, if so, is it such a law as is controlled by the mandate of the constitution as set forth in section 26 of article 5, as above quoted, to the effect that " all laws relating to courts shall be general and of uniform operation ? " How would these words in the constitution, taken both in their popular and in their technical sense, strike the average mind in answering this question ?

The act is a law. Does it relate to courts ? Webster and other standard authorities state that the word " relating " means " in reference to," " in respect to," " in regard to." This act certainly had reference to, is in respect to, and is drawn in regard to, courts. It not only fixes the salaries to be paid to the judges of all of the courts, but it regulates the method of payment. We do not mean to maintain by this that " judges " and " courts " are always synonymous terms, but we do hold that the act in question is an act relating to courts, as the judges, in any sense in which the term may be used, constitute

the most important part of a court, and the act fixes and reg-
ulates the payment of salaries to those judges who are the offi-
cers constituting the courts, and in whom the constitution
vests the judicial power of the commonwealth.

Among the various definitions of a court, in Anderson's Law
Dictionary, we find a court stated to be " A tribunal estab-
lished for the public administration of justice, and composed
of one or more judges, who sit for that purpose at fixed times
and places," etc.  " The term ' court ' may mean the ' judge ' or
' judges ' of the court, or the judge and the jury, according to
the connection and the object of its use."

So that it would seem plain that an act, such as the act of
1903, is an act relating to courts.

What is meant by the term "shall be general ? "   Ander-
son's Law Dictionary: " Relating to a whole genus or kind, to
a whole class or order; whether of persons, relations, things
or places."   Bouvier : " Laws which apply to and operate uni-
formly upon all members of any class of persons, places or
things, requiring legislation peculiar to themselves in the
matter covered by the laws."

It can be said that general laws are those that are framed
in general terms, restricted to no locality, and operating equally
upon all of the group of objects, which, having regard to the
purpose of the legislation, are distinguished by characteristics
sufficiently marked and important to make them a class by
themselves.

What is meant by the words " uniform operation " as used
in this section of the constitution ?   Again we refer to Ander-
son's Law Dictionary, which states : " The operation of a law
means its practical working and effect ; " and " that ' all law of
a general nature shall be uniform in their operation' means
that such laws shall bear equally, in their burdens and bene-
fits, upon persons standing in the same category."   Again,
" Every law of a general nature must operate equally upon all
persons brought within the relations and circumstances pro-
vided for."   Again, " A law is uniform when all persons
brought within the relation and circumstances provided for are
affected alike, when it has a uniform operation upon all within
the class upon which it purports to operate."

" We are not at liberty to presume that the framers of the

constitution, or the people who adopted it, did not understand the force (of) language: " People v. Purdy, 2 Hill (New York), 31.

It would seem from this analysis, that the provision of the constitution to the effect that all laws relating to courts shall be general and of uniform operation, can well be held to require that a law fixing the salaries of judges, and providing the method of payment, must not only be general in its terms, but must go further and operate uniformly upon all the judges at one and the same time, and it can well be presumed that the legislature had this in mind when they passed the act of 1903, for it is most plain that it was the legislative intent that this act should take effect and operate uniformly upon all judges in the state at one and the same time ; for the act provides the time of its going into operation to be " From and after the first day of January, 1904." When an act provides from and after a day named, the day named is excluded : Arnol v. United States, 13 U. S. 104 ; Hampton v. Erenzeller & Baker, 2 Brown, 18. Hence, the legislature intended this act to take effect and the new salaries to begin on January 2, 1904, and the term of the office of all judges learned in the law elected after the approval of the act commenced on the first Monday of January, 1904, which was January 4. It is thus clear that on January 2, 1904, there were no judges in office other than those who were in commission at the time of the passage of the act, so that either the said act must have been intended to operate in favor of the judges in commission at the time of its passage, or, for an interval, from and after January 1, 1904, it was entirely inoperative, in contradiction of its express terms.

It will not do to say that the words of the constitution in this section " all laws relating to courts shall be general and of uniform operation," are merely general words, and are restricted by the words which follow in the same section. A consideration of the section will show clearly that this is not so. A comma follows the word " operation," and then we have a new part beginning with the word " and," followed by " the organization, jurisdiction and powers of all courts of the same class or grade, so far as regulated by law, and the force and effect of the process and judgments of such courts shall be uniform." It is most plain that these words, standing by

themselves, make clear and good sense without relation at all to the words which precede them ; and, therefore, the words in the preceding part must be presumed to have a meaning of their own.

The section is in three parts. The first part is clearly intended to cover laws generally which may be enacted from time to time by the legislature concerning any matter relating to the courts, such, for instance, as the act of 1903 in question. The next part is clearly intended to cover and require uniformity in laws which may be enacted by the legislature from time to time relating to the organization, the jurisdiction, the powers and the means used to carry into effect the powers of the courts. And the last part, which is as follows, " And the General Assembly is hereby prohibited from creating other courts to exercise the powers vested by this Constitution in the judges of the courts of common pleas and orphans' courts," is clearly intended to prevent the legislature from creating courts which would be beyond the constitutional prohibitions contained in the first two parts.

The regulation that all laws shall be general which may be enacted from time to time by the legislature regarding the jurisdiction of and practice in the courts, in the broadest sense of the terms, is fully covered and provided for in section 7 of article III of the constitution.

In considering this question of uniform operation, and keeping in mind that the people who voted for and adopted the constitution were supposed to have looked at, understood and intended its provisions in a plain rather than in a technical way, we have a right, in an effort to get at its true meaning, to consider the obvious consequences which would follow a construction of the act of 1903 to the effect that the act is unconstitutional in its attempt to increase the salaries of judges in commission at the time of its approval. New and inexperienced judges would draw salaries considerably larger than old and experienced members of the judiciary. We would practically be face to face with a declaration by the legislature, as shown by the act of 1903, that the salaries paid to the older judges are inadequate and not up to the adequate standard required by the constitutional mandate ; and this condition would be impossible of remedy, or, at least, it could not fade out until all of the present members of the Supreme Court, with their

long terms of service yet to come, had passed from the scene, by which time we can fairly believe, according to the well-known fluctuations of the value of money, salaries would again have to be readjusted, with the like condition of inequality repeated and covering another long period of years. This shows the apparent necessity for a uniform operation of any law fixing the salary of judges ; and it seems almost impossible that we should presume that the people, when they adopted the constitution in 1873, ever understood or intended that the fundamental law of the state should have or be given a meaning which would bring about and make practically irremediable such an unjust and vicious state of affairs as would follow a different construction. It is much easier to believe that knowing the fact that the terms of the judges were fixed at periods a great deal longer than the terms of any other of the important public officers, to wit: from ten to twenty-one years, they intended and meant what they said in the constitution, that all laws relating to courts should be general and of uniform operation in this respect just as much as in all and every other respect.

" When a particular construction of an instrument leads to hardship, inconvenience or absurdity, respect due from courts to a co-ordinate branch of the government or to a constitutional convention, will not permit them readily to presume that such construction was intended: " Taylor v. Taylor, 10 Minnesota, 107.

If we are correct in our conclusions, that, under section 18 of article V, the legislature had the right and was merely carrying out a constitutional mandate when it enacted the act of 1903, fixing and raising the salaries of judges, and that that act is a law relating to courts, then section 26 of article V requires that such a law shall not only be general but shall be of uniform operation, meaning that it shall operate on all members of the judiciary at one and the same time. And it follows that section 13 of article III, " No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment," cannot be held as applicable to the judiciary, for it is utterly impossible to carry out the mandates of that section and at the same time have any law fixing the salary of judges which would be general and of uniform operation.

We are convinced, after a most thorough investigation of all the authorities cited by counsel on each side at argument, and considerable original research on our own part, that the act of 1903, increasing the salaries of judges, must be held to apply to all the judges in the state, including those who were in commission at the time of its approval, as well as those who have taken office since.

If, after the thoughtful consideration which we have given to the matter, we still had a doubt as to whether or not the act was constitutional in its attempt to increase the salaries of those judges who were in commission at the time of its approval, it would be our duty to resolve that doubt in favor of the constitutionality of the act in this respect, but we prefer not to place our decision upon any such ground, but to rest it upon the ground that we conceive the act to be constitutional in its application to all of the judges in the state, and that it is the duty of the state treasurer to honor the warrants of the auditor general which have been and which may hereafter be drawn under this act to their full extent.

The writ of mandamus is awarded as prayed for, as per formal order to that effect filed herewith.

BELL, P. J., concurring:

The very able and convincing opinion filed by my colleague, Judge VON MOSCHZISKER, wherein he most exhaustively reviews the legal authorities and considers the questions involved in their various phases, renders my labor in writing this opinion one of mere supererogation. In this opinion no attempt will be made to discuss the matter except in a most general way, and, in fact, it will contain, in effect, a mere summarization of the conclusions reached by my said colleague after a most elaborate and satisfactory review by him of the subject.

The first question argued before us was the right of the state treasurer to object to paying warrants drawn by the proper officer, namely, the auditor general, under the provisions of an act of assembly duly passed, out of moneys specifically appropriated for that purpose. The attorney general contended that the state treasurer was in such a case a mere ministerial officer, bound to pay out the money, not competent to question

the constitutionality of the will of the legislature, evidenced by
a statute regularly enacted. Mr. Carson, in effect, sought to
liken the state treasurer to the disbursing officer of a corpora-
tion. If the board of directors had duly authorized the expendi-
ture, and the warrant was properly drawn, most certainly such
disbursing officer would not be allowed to refuse payment be-
cause he doubted whether the directors had acted wisely in
making the expenditure. The argument of the attorney gen-
eral is not without some seeming plausibility, but its vice con-
sists in losing sight of the fact that the state treasurer is a high
official, sworn to protect the constitution, and an unconstitu-
tional statute is a nullity, gives no authority, extends no pro-
tection, and is binding on no one.

It may be that the doctrine contended for by Mr. Carson is
applicable to the case of an inferior officer, whose duties are
entirely ministerial, but the weight of authority, as shown by
the review of the adjudicated cases contained in the opinion
of Judge VON MOSCHZISKER, is that it is inapplicable to the
case of a state treasurer.

The attorney general justified his course in raising this pre-
liminary question by reason of his fear that the establishment
of a contrary doctrine might result in a constant clash and a
mischievous friction between the various branches of the state
government. That such fear is groundless is shown by the
fact that in the thirty years elapsing since the passage of our
state constitution, the state treasurer, so far as we learn from re-
ported cases, has only in very rare instances questioned the au-
thority of the legislature. In at least one of said rare instances,
namely, Com. ex rel. Wolfe v. Butler, 99 Pa. 535, the state
treasurer declined to pay on the advice of the attorney general.

The second question for decision may be briefly stated thus:
Is the Act of April 14, 1903, P. L. 175, unconstitutional and
invalid as respects judges in commission at the date of its going
into operation so far as it attempts to increase the salaries of
said judges?

The argument against the constitutionality of said act is
founded on section 13, article III, of the state constitution,
which reads as follows: " No law shall extend the term of any
public officer, or increase or diminish his salary or emoluments
after his election or appointment."

Unquestionably judges are public officers, and if the said section 13 contained the only reference to their salaries, its mere citation would be conclusive; such salaries could not be increased after election or appointment. But a constitution is not to be construed by concentrating the focus of our vision on a single provision of the instrument; a broad view must be taken of all its provisions and stipulations; and in case of conflict between different sections, that construction must be adopted which will reconcile the apparent inconsistencies, and, if possible, allow each particular section to stand. If any authority is needed for this legal proposition, which is founded on common sense as well as reason, it will be found in the opinion of my colleague.

Turning then to the constitution and viewing it as a whole, we find that the salaries of judges are particularly provided for in section 18 of article V. This section is headed, " compensation of Judges," and its language is as follows : " The judges of the Supreme Court, and the judges of the several courts of common pleas, and all other judges required to be learned in the law, shall, at stated times, receive for their services an adequate compensation, which shall be fixed by law and paid by the State. They shall receive no other compensation, fees or perquisites of office for their services from any source, nor hold any other office of profit under the United States, this State or any other state."

It is significant that the constitution only contains specific reference to the salaries of two other classes of public officers, namely, magistrates of the city of Philadelphia, section 12, article V, and county officers, section 5, article XIV. And such specific reference in each of said two instances had in view the abolishment, so far as might be, of the system of compensating officers by fees, which system was pernicious as affording a constant temptation to extort illegal perquisites.

Bearing in mind the absence of all other provisions as to salaries, except in the case of judges, and the careful and emphatic language with which such latter salaries are guarded, would it not strike even the lay mind that there must be some reason for such specific action in the matter of the compensation of judges ?

And if, in addition, we remember that the word " adequate, "

used in connection with judges' salaries, was the creation of Alexander Hamilton to meet the contingency that the purchasing power of money might vary, the business of courts and the living expenses of judges might increase, and that their term of office was much longer than that of any other officials, the reason for such specific reference to their salaries becomes apparent.

The idea that said salaries are to be deemed in a class by themselves is further strengthened when we ascertain that said section 18 of article V is almost a literal rescript of a similar provision in our state constitutions of 1790 and 1838 (with certain changes, shown by my colleague to be immaterial), and that the legislature, while said constitutions were in force, had on several occasions increased the salaries of judges in commission, and that our Supreme Court had justified such increase by reason of the peculiar and emphatic language of said section.

When the framers of the present constitution saw fit to readopt the language found in former constitutions, which language had been judicially construed, they knew or ought to have known that the familiar legal rule would apply, that judicial construction follows and is engrafted on an expression repeated in a subsequent instrument, and no language used in debates or manifesto issued by some committee should be allowed to alter such legal rule.

As shown by the authorities cited by my colleague, it is a rule of judicial construction, that when there is a conflict between a general intent and a specific enactment, the general intent must yield rather than the specific enactment. In the present instance the general intent, as shown by section 13, article III, is that no law shall increase the salary of a public officer after his appointment. The specific intent, for reasons which we have stated, is that in the peculiar cases of judges, their salaries may be increased.

But it is said that the debates of the founders of the constitution show that a majority of the members of that body supposed that the provisions of section 13, article III, did apply to the salaries of judges, and this was the main burden of the very able and plausible argument of Mr. Gilbert, counsel for the state treasurer. A reading of said debates does show

that the advocates of the right to increase the salaries of the judges did fear that such might be the case, and to provide against such a contingency, they offered amendments which failed to be adopted; but, on the other hand, the enemies of a right to an increase of judicial salary feared that said section 13 might not affect judicial salaries, and sought to amend so that the language would be positive and unequivocal ; and further sought to amend section 18 of article V by an express provision against the increase of salaries ; but their efforts to so amend likewise failed.    It was, as Mr. Carson put it in his argument, an attack and a repulse, a counter attack and a counter repulse.

But grant, for the sake of the argument, that a majority of the members of the convention did suppose that their work warranted the construction placed on it by Mr. Gilbert on behalf of the state treasurer.    As my colleague has shown by the citation of numerous authorities, we are not to resort to the debates of a constitutional convention for the true construction of the written paper.    The question is not what they thought or imagined they meant, but what is the legal import of the language with which they saw fit to clothe their thoughts ?    To rule otherwise would be to render a constitutional provision as susceptible of two constructions as were the oracles of Delphi.

Mr. Gilbert laid considerable stress on the report of a committee, a copy of which with commendable diligence he unearthed in a comparatively rare book, to wit : the Journal of the Constitutional Convention.    But in laying such stress on such report he loses sight of the main and prominent features of the proposed constitution, which prominent features were called to the attention of the people of Pennsylvania before they voted on said instrument in 1873.

One of said main features, a radical change from former constitutions, was the idea of generality and uniformity.    The Pamphlet Laws in the '60's and '70's had grown bulky with special legislation, ranging from the charter of the Credit Mobilier to an act giving a constable of some remote township fees in excess of those received by his fellow peace officers.    To remedy this evil the language of the constitution enjoined generality and uniformity of legislation on the same classes

of subjects ; and as my colleague shows, uniformity of operation in the matter of laws relating to courts and judges.

But if we adopt the contention urged on behalf of the state treasurer, we are driven to a condition, not of uniformity, but of inequality, and that of the most unreasonable and absurd character. What would be thought of a railroad which paid its youngest engineer, recently promoted from a fireman, and intrusted only with the handling of a shifting engine, a greater salary than that paid the veteran train runner, intrusted with the lives of hundreds of passengers, and guiding the swiftly moving express train with a skill gained by years of experience ?

But we are forced to such an unreasonable and absurd condition of affairs if we adopt the construction contended for by the respondent. In such event, were John Bannister GIBSON on the supreme bench to-day, for the balance of his life the state of Pennsylvania would be compelled to pay him a smaller compensation than that accorded to the most recently appointed justice. If PEARSON and ELWELL were still sitting as trial judges, despite their learning, experience and eminent fitness, shown by long years of arduous judicial labor, we would be powerless to pay them a salary equal to that received by the young judge just elected, whose fitness was an unknown quantity, and who was devoid of any judicial experience. Surely a construction which would lead to such results—results which would be deplored by the conservative citizens of our commonwealth—ought not to be adopted unless it is expressly so written ; but, as my colleague has shown, it is not so written, and if we are in doubt as to the true construction to be adopted, such doubt must be resolved in favor of the constitutionality of the law.

A writ of mandamus is therefore awarded, as per formal order herewith filed.

*Error assigned* was the order of the court.

*Lyman D. Gilbert* and *William B. Broomall,* with them *Ward R. Bliss,* for appellant.—A judge is a public officer lawfully appointed to decide litigated questions according to law : Bouvier's Law Dictionary ; 17 Am. & Eng. Ency. of Law, 716 ;

Anderson's Dictionary of Law, 575; Com. v. Gamble, 62 Pa. 343.

As judges are public officers, the only rational conclusion that can be reached is that they, with respect to their salaries, are under the direction and control of the provisions of section 13 of article III of the constitution.

The position which has been taken by those who oppose our contention is that an adequate compensation cannot be made for a judge unless the legislature is at liberty at all times to change it to meet the exigencies of conditions. Unless the legislature has such power it is impossible for them to obey the mandate and provide an adequate compensation, and, therefore, the mandate will be unperformed.

A consideration of this position suggests the inquiry as to how frequently the legislature should have the power to change the compensation. The compensation cannot be ordained for each one of the judges, no matter how valuable his services may be, nor how much it may cost him to live. The compensation cannot be ordained at more frequent periods than two years and it, therefore, comes to this that the adequate compensation must be fixed by general law applying to all of the judges in classes and applicable for a term of years.

Why may not a full effect be given to both of these clauses? Why may not an adequate compensation be provided for a judge for a term of twenty-one years, or for a term of ten years, as well as for a term of two years intervening between two sessions of the legislature? The adequate compensation must be fixed in advance and stated times ordained for its payment. It must be fixed by law. The adequacy or sufficiency of the compensation must be determined by the legislature. It must be a legislative judgment formed in advance of the services rendered, based upon all of the pertinent considerations. If the trend of adequate consideration is upward, more allowance will be made for a long term than a short one. An adequate compensation for a term of ten or twenty-one years would result in giving a judge something more than sufficient for the earlier years of his service, and something less then sufficient for the later years of his service, and still the adequacy of compensation for the entire term be preserved. In this view there is nothing anomalous in a new incumbent receiving more per

annum than an old incumbent.    Both of them may be receiving an adequate compensation graded for a long term.   An adequate compensation for service is the meeting point between the strife of the person who receives the service and the person who renders it.    The person who receives the service is moved by the value to him of that which he gets, and the person who renders the service is moved by the time he has to work to produce that which he gives.    Both presuppose that the compensation must be sufficient to enable the producer to live ; otherwise the receiver could get nothing and the producer could give nothing.    A compensation may be more than adequate or less than adequate.    Adequate, according to the Century Dictionary, is " equal to requirement or occasion ; commensurate ; fully sufficient, suitable or fit."    The primary meaning of adequate is " equal to," with a secondary meaning of " fully " and may, therefore, be properly defined as "fully equal to."    It is derived from the Latin verb " adaequare," which signifies " to make equal to."    The verb is composed of the preposition ad, " to," and the adjective aequus, " that extends or lies in a horizontal direction, plain, even, level, flat."    A compensation is adequate in the mind of the employer when it is fully equal to the value of the thing he gets, and in the mind of the employee when it is fully equal to the time and labor he gives.

Although the 17th section of the schedule to the constitution directed that the fixing of the judicial salaries should take place at the first session of the legislature, it would be but sticking in the bark to hold that a failure to do this at the first session would invalidate the act when it might subsequently be done.

The Act of June 8, 1881, P. L. 56, fixing the salaries of the judges of the Supreme Court, the Act of June 4, 1883, P. L. 74, fixing the salaries of the judges of the court of common pleas, and the Act of June 13, 1883, P. L. 91, increasing the salaries of the judges of the orphans' court covered the whole field of the constitutional mandate and carried out the direction of the schedule.    The legislature is to decide what is an adequate compensation for judges : Commonwealth v. Mann, 5 W. & S. 403.

A constitution is not to receive a technical construction like a common-law instrument or a statute.    It is to be inter-

preted so as to carry out the great principles of the government, not to defeat them: Commonwealth v. Clark, 7 W. & S. 127; Monongahela Nav. Co. v. Coons, 6 W. & S. 101.

"Next to permanency in office, nothing can contribute more to the independence of the judges than fixed provision for their support. . . . In the general course of human nature, a power over a man's subsistence amounts to a power over his will. And we can never hope to see realized in practice the complete separation of the judicial and the legislative power in any system which leaves the former dependent for pecuniary resource on occasional grants of the latter:" Commonwealth v. Mann, 5 W. & S. 403; Foust v. Commonwealth, 33 Pa. 345; Commonwealth v. Gamble, 62 Pa. 246.

*Hampton L. Carson,* attorney general and *John G. Johnson,* with them *Frederic W. Fleitz,* deputy attorney general for the commonwealth.—There is nothing in federal jurisprudence which forbids the increase of salaries of judges already in office; on the contrary, the right to such an increase has been carefully secured.

Under the constitution of Pennsylvania of 1790, as amended in 1838 and in 1851, the right to an increase of salary existed in favor of judges in commission.

There is no contract between a judge and the state that he will serve out his term without an increase of salary: Com. v. Bacon, 6 Sergeant & Rawle, 322; Barker v. Pittsburg, 4 Pa. 49; Butler v. Pennsylvania, 51 U. S. 402.

The language of section 18, of article V of the constitution of 1873 is substantially, if not identically, the same as that of the constitution of 1790, 1838 and 1851; and the striking out of the prohibition against a diminution of salary is not equivalent to the insertion of a prohibition against an increase of salary.

The words "any public officer" as used in section 13 of article III do not apply to the judges of our courts.

All presumptions are in favor of the act: Craig v. First Presbyterian Church, 88 Pa. 42; Wolfe v. Butler, 99 Pa. 535; Sugar Notch Borough, 192 Pa. 349.

The debates in the convention cannot control interpretation: Hobbs v. Fogg, 6 Watts, 553; Weigold v. Pittsburg, etc., R. R. Co., 208 Pa. 81.

Assuming for argument's sake that the judges are within the meaning of the 13th section of article 3 of the constitution, the 17th section of the schedule has not been complied with prior to the passage of the act of April 14, 1903. The obvious meaning of the section was the passage of a general bill to fix the compensation of the judiciary. The passage of separate bills relating to the judges of the supreme, common pleas and orphans' courts respectively would not answer the condition. It is the judges as a class whose compensation shall be fixed. An examination of the salary acts passed prior to that of 1903 will show that there was neither a literal nor substantial nor intended compliance with the mandate of the schedule. If the series of acts was intended as compliance with the schedulary mandate, it would be expected that they would have some apparent link. It is incredible that acts passed after intervals of seven (Act of June 8, 1881, P. L. 56, as to Supreme Court judges) and nine years (Act of June 4, 1883, P. L. 74, as to common pleas judges) without any probable connection should have been so intended. The suggestion of substantial compliance with the mandate by the passage of this series of acts, is conclusively met by this consideration, that it produces classification which is not only inconsistent with the spirit of the constitution but works injurious discrimination as between the classes into which the judges are divided. The provision that the salaries of the judges should be fixed at the next session of the legislature was for the purpose of adjusting their compensation according to a standard of which time in the interest of equality was of essence. The standard by which the salaries of the common pleas judges, with and without orphans' court powers, was fixed in 1883 was not the same as that by which those of the separate orphans' court judges was fixed in 1874, and the latter must lose the benefit of the increase during the term for which they were elected, whilst the objects of the latter act take presently. There is no warrant for this in the constitution. The obvious meaning of both the 13th section of article III of the constitution and the 17th section of the schedule was to deal with the judges as a single class. Their compensation according to the first should neither be increased nor diminished during the term for which they should be elected, but this provision according to the second should not go into

operation until their compensation as a class should first be " fixed and determined " by necessary implication at a common time.    There is nothing in the language used to justify an inference that the 13th section should go into operation on the installment plan—so much in 1874, so much in 1881 and so much in 1883.    The single purpose of the schedulary mandate was to adjust the salaries of the judiciary as a condition precedent to the operation of section 13 of the constitution.    The act of 1903 is the first which shows compliance with the mandate of the schedule in form and effect.    It deals with the judiciary as a class on a common standard of time in the adjustment of compensation.

OPINION BY MR. JUSTICE THOMPSON, December 31, 1904 :

The universal rule of judicial action is that judges sit in cases in which they are interested only under compulsion of necessity arising from the entire failure of any other competent tribunal.    In the present case, one judge is wholly free from interest, and, by force of this fact, the powers of the court necessarily devolve upon him.    If one or two or even a majority were disqualified by interest, the powers of the court would be exercised by the others without question.    The fact that only one is free from interest makes no difference in principle ; it is merely more inconvenient.    The disposition of the question raised on this appeal has therefore devolved on the only member of the court not interested in the case, the other members of the court having declined to consult or to enter into any discussion of the case.

The question raised in this appeal is whether the act of assembly entitled " An Act to fix the salaries of the judges of the Supreme Court, the judges of the Superior Court, the judges of the courts of Common Pleas and the judges of the Orphans' Court," approved April 14, 1903, P. L. 175, applies to all judges then in commission or only to those thereafter to be commissioned.    If it be applicable to the latter only then judges upon the same bench, engaged in the performance of exactly the same judicial functions would receive different compensation, those senior in commission smaller and those junior larger compensations.    A condition so anomalous, so inequitable and so clearly repugnant to every principle underlying judicial compensation,

should not be tolerated unless it be the unavoidable result of a clear and plain mandate of the constitution, and such only should be its warrant.

The constitution creates three co-ordinate branches of government; the legislative, the executive and the judicial, and with a view to the highest and best results for common welfare, clothes them with independent and complete powers. The people having in them inherent all power, have in their fundamental law carved out of it distinctive powers for these respective co-ordinate departments of government and making each one exclusive and independent within its province of action, have given to it those elements of power necessarily incident to it and no more. Each therefore has its well-defined limitations and the preservation of such exact limitations will necessarily best conserve the harmony of the whole.

The judiciary article establishing the judicial branch of the government, contains full and complete powers for conferring jurisdiction, for creating organization, for providing for compensation and for making other essential and subordinate provisions relating to it. The powers distributed to it in the division of powers among the co-ordinate branches of government are within its province, complete, exclusive, unfettered and supreme and especially in regard to the compensation of its judges, its mandate speaks in no doubtful or uncertain language. It requires that they shall receive adequate compensation, to be fixed at stated times by law and paid by the state, and it prohibits all other compensation by way of fees or perquisites.

Our early constitutions, namely, that of 1790 and that of 1838, following directly in the path of the federal constitution were restrictive only as to a diminution of judicial salaries, but not so as to an increase thereof. It may be said that the reasons for not restricting the power to increase judicial compensation, as evidenced by these constitutions are in view of new conditions and enlarged functions springing from increase in population and business, so manifest that a discussion of them would seem vain iteration. The power to increase judicial salaries under those constitutions has never been seriously questioned and the evidence of it may be found in the case of Commonwealth v. Mann, 5 W. & S. 403. As the power to increase judicial salaries was not prohibited by them, it is equally

true that the present constitution has not done so. The words of its judiciary article, with the exception of the modification of the phrase " fixed by law " and the elimination of that relating to diminution of salaries, are identical with those used in the judiciary articles of those constitutions. They contain a clear mandate that the judges " shall at stated times receive for their services an adequate compensation, which shall be fixed by law and paid by the state." This article complete in itself for the purposes of that co-ordinate branch of government, unequivocally expresses the mandate for the adequate compensation of its judicial officers and clearly negatives any restriction in regard to any increase thereof. Standing alone with a full grasp of the subject, it gives beyond question or doubt the power in case of inadequacy to increase judicial compensation to adequate amounts during incumbency.

But it is contended that to complete the article it is necessary to import into it from the legislative article of the constitution, article 3, section 13, wherein it is provided " no law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment." In that article surrounding the section in question on the one side are different sections relating to special and local legislation, to notices in regard to special bills, to signing of bills, to public contracts for supplies and upon the other side are others relating to revenue, appropriation bills, charitable and educational and limitations of appropriations. Such environments manifestly do not indicate that the section has any relation to the judiciary or is in any manner incident to it, but on the contrary are evincive that it is intended to have no application whatever thereto. An attempt to read it as if actually a part of the judiciary article, demonstrates an incongruity so apparent as to constitute a complete negation of any applicability to the judiciary, but even if it should appear to contain an intention to restrict generally and if such general intent be in conflict with the subsequent particular one contained in the judiciary article, the latter or particular intent being the later expression of the will of the people would dominate. Moreover, in case of antagonism between the section in question and the judiciary article, resulting in a contest for supremacy, the article must prevail in such contest because it creates a co-ordinate branch

of government, and no mere limitation of legislative powers contained in another part of the constitution and relating to a different branch of government can be permitted to become a weapon to be used to rip up the very vitals of the co-ordinate branch so created and become destructive of that which is essential to its existence.

In the case of Commonwealth v. Griest, 196 Pa. 396, Mr. Justice GREEN, says :

" Before passing to the question of authority, only one more thought needs expression.   It is (3) that these two articles of the constitution are not inconsistent with each other, and both may stand and be fully executed without any conflict.   One relates to legislation only, and the other relates to the establishment of constitutional amendments.   Each one contains all the essentials for its complete enforcement without impinging at all upon any function of the other.   And it follows further that because each of these articles is of equal dignity and obligatory force with the other neither can be used to change, alter or overturn the other."

It cannot be successfully contended that the judiciary under the article is entitled to a right and that by the construction of another part of the constitution such right is destroyed and made nugatory.   A construction leading to such result would lack the essential elements that should prevail in constitutional construction and would be violative of the rule that a constitution is " to be interpreted to carry out the great principles of government and not to defeat them."   The mandate of the judiciary article is that the judges during their constitutional terms of office shall receive at stated times adequate compensation for their services.   The word " adequate " has a plain meaning and is clearly understood by people generally.   Words used in the fundamental law are not to have a technical meaning, but are to be understood in the sense in which people generally understand them.   The word in question is plain ; it means fully equal to requirements or occasions, commensurate, and no resort to derivatives is required to determine its meaning.   It does not mean average or graduation.   When in appellant's argument it is said, " an adequate compensation for a term of ten or twenty-one years would result in giving a judge something more than sufficient for the earlier years of

his service and something less than sufficient for the latter years of his service and still the adequacy of his compensation for the entire term be preserved," it is but an attempt to make " adequate " the equivalent of average and to indicate a feast or a famine.   Again, in that argument when it is also said that " there is nothing anomalous in the fact that Judge A., in the tenth year of his incumbency is receiving a compensation which a legislature ten years ago deemed adequate and that such compensation is less than the compensation of Judge B., who is in the first year of his incumbency and whose compensation was deemed adequate by another legislature a year ago," it is an effort to resolve adequacy of compensation into graduation. Thus the trail of that argument becomes so attenuated as to be almost lost in a wilderness of words.

In order to secure adequate compensation, both to existing judges by way of increase and to those subsequently appointed or elected, the constitution speaks clearly by its schedule, No. 17, where it provides :  " The General Assembly at the first session after the adoption of this constitution shall fix and determine the compensation of the Supreme Court and of the Judges of the several Judicial Districts of the Commonwealth." An act executing the mandate of this schedule, must, in view of the command contained in the fundamental law, necessarily fix a compensation that is adequate and when its adequacy is thus " fixed and determined " in pursuance of the constitutional requirement, it becomes definitely then settled, prohibitive of decrease and permissive of increase in case of inadequacy, springing from changed conditions.   The constitution by this mandate thus clearly indicates an increase of the then existing salaries if necessary to do so in order to make them adequate.   Tentative and partial acts in this direction have from time to time been passed increasing different salaries, but there has been no substantial compliance with the requirements of the schedule until the present act, which is general in title and of a broad scope, manifestly intended to carry out the mandate.   Those partial attempts not having operated to exhaust the power, its exercise by the present act is manifestly within the command contained in the schedule. By that act the legislature under the mandate to determine adequacy of compensation, has declared that the salaries there-

in provided for are adequate for the judges of the different courts. There can be but one adequate compensation for each of the judges of the same court because no matter how much greater the experience or learning of one member of it may be than that of another, there can be no difference in the actual performance of the judicial functions. The judicial genius who brings the highest order of learning and ability to bear in such performance, stands upon the same level with the merest tyro of a judge, whose learning and ability in comparison may be as the shadow is to the substance. It is futile to contend that there may be different adequate compensations for different members of the same court.

It is contended that the words public officers used in the thirteenth section of article III, should be applied to judges as public officers and the power to increase the salaries of those in commission at the date of the act did not exist. The jurisdictional powers of judges, their judicial functions, their constitutional terms of office, their well-defined position in the co-ordinate branch of the government indicate a distinctive class of persons required to perform particular functions. They exercise the powers vested in courts, as such, and not in them as officers qua officers, with duties specifically designated as in case of public officers. The constitution declares that the judicial power of the commonwealth (that is the judicial sovereignty of the people) is vested in the Supreme Court and other courts, and the exercise of their functions, their decisions, and all that emanates from them, becomes judicial; they are not public officers within the generic words used in the section in question. Those words are not used as applicable to all public officers. If it had been intended in the fundamental law to do so, doubtless exact words to accomplish that result would have been used, but when the constitution makes a distinctive provision prohibiting an increase of the compensation of certain public officers, such as members of the legislature, it is manifest that these words were not used in a general sense and by no construction can they be generically applicable to the judiciary. A comparison of the phraseology used in the section with the language of the article makes this apparent.

The judiciary article fixes the terms of the judges' offices

and strikes down emoluments and the first phrase of the thirteenth section as it relates to extending the term of public officers cannot relate to those of the judges, which are definitely fixed by the constitution and that which relates to emoluments can have no application to them, because under the article they are prohibited from receiving any. But it is said that if the public officers referred to in the section are to be limited to those created by the legislature, the officers so designated would be few in number and the presumption is that the constitution would not be operative to effect a result so vain, but appellees have furnished a list of public officers to whom it applies, with salaries ranging from $2,500 to $4,500 per annum and connected with some nineteen different departments of government. Surely the constitution does not do a vain thing by providing against the possibility of undue and improper extension of the terms and the increase of compensation of so numerous a class of public officers. Because such is the scope of the section and because it was a limitation of legislative power in that regard, it was placed in the heart of the article on legislation and its words indicate a restriction limited to a definite class of public officers only and cannot by construction be coupled with the judiciary article so as to make them applicable to judges.

But it is contended that if the section be not applied to all public officers as contended for by the appellant, the executive and judiciary will be placed at the mercy of the legislative departments of the government, and the result will be subversive of the equipoise of the government. It is hardly necessary to build bridges with which to cross streams that may never exist and it is scarcely wise to make possible fears a ground for judicial construction. If they should be, judicial construction might become emotional in character; judges of timid nature responding to their fears, might confine constitutional constructions within too narrow limits, and those possessing great courage, might extend them to perilous ones. But the fears suggested seem more fanciful than real. The executive with its veto and other associated powers is quite able to protect itself against aggression from the legislative department. Even if open to attack, the judiciary with a high standard of official conduct need have no fears of successful assault. Encircled

by confidence and respect, the anathema of the people ever ready to protect it as the surest safeguard of rights and property, would fall with crushing effect upon aggressors, and breed a consternation that would repel attack. The contentions of the appellant must be resolved against him and the assignment of error cannot be sustained.

The judgment is, therefore, affirmed.